

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

FJN:TBM/CWE/RMS
F. #2022R01073

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 2, 2024

By ECF

The Honorable LaShann DeArcy Hall
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re: United States v. Jonathan Goulbourne
       Criminal Docket No. 22-106 (LDH)

Dear Judge DeArcy Hall:

  The government respectfully submits this letter in advance of defendant Jonathan Goulbourne's sentencing, which is scheduled for June 14, 2024. The defendant was convicted of obstructing justice, in violation of Title 18, United States Code, Section 1512(c), in connection with an armed robbery and homicide. As set forth below, a sentence within the range of 108 to 135 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentencing.

I. Factual & Procedural Background

  A. Offense Conduct

  The defendant was a longstanding member of an armed robbery crew that targeted marijuana dealers throughout New York City. See Presentence Investigation Report dated May 10, 2024 ("PSR") ¶ 3. The defendant participated in at least three armed robberies of marijuana dealers, one of which resulted in the murder of one of the victims. Id. ¶ 3-12.

  First, on July 6, 2020, the defendant, co-defendant Marcus Ricketts and two co-conspirators robbed an individual ("Victim #1") in the Bronx, New York, after they feigned interest in making a bona fide purchase of marijuana, while intending all along to rob Victim #1 of the drugs (the "Bronx Robbery"). Id. ¶ 4. When Victim #1 showed them the marijuana,

which he had secreted in the trunk of his car, the defendant held Victim #1 at gunpoint, while Ricketts stole the drugs.[1]  See id.

Second, on October 16, 2021, the defendant, co-defendants Mark Goulbourne (his brother), Ricketts, and Romeo Jonas, and other co-conspirators robbed an individual ("Victim #2") at gunpoint in the vicinity of his store in Staten Island, New York, during another sham marijuana deal (the "Staten Island Robbery").  Id. ¶ 5.  Jonas and other members of the crew held Victim #2 at gunpoint, ordered him to the floor, and threatened to kill him.  Id.  The defendant had rented a Dodge Caravan earlier that very day, which he used to drive to the Staten Island Robbery, and which was then used to transport most of the stolen marijuana, amounting to approximately 100 pounds.  See id.

Third, shortly after midnight on December 3, 2021, the defendant, Mark Goulbourne, Ricketts, Jonas, co-defendants Amari Webber, and Chevonne Williams, and other co-conspirators, committed another gunpoint robbery during a sham marijuana deal, resulting in a shootout that led to the death of Gregory Baratta (referred to in the PSR as Victim #3) and a gunshot wound to a second individual ("Victim #4") (the "Brooklyn Robbery & Homicide").  See id. ¶¶ 6-7.  The deal had been days in the making, see id. ¶¶ 6-7, and the defendant was responsible for locating the victim for the Brooklyn Robbery & Homicide.[2]

On December 1, 2021, Baratta arranged a "show and tell" of the marijuana requested by the crew at an apartment in Queens, New York, which was attended by Mark Goulbourne and Ricketts.  Id. ¶ 6.  Historical cell-site data reveals that the defendant was in the immediate vicinity of the show and tell, far from his home in Brooklyn, and exchanging telephone calls with Mark Goulbourne at the time of the show and tell, using the JG Phone.  Ricketts and Mark Goulbourne agreed to purchase the marijuana, and the transaction was

---

[1] By letter dated May 24, 2024, the defendant objected to the PSR's statement that he held a gun, asserting: "The victim apparently is mistaken about which individuals were armed and pointed guns at him."  See Def. Letter to Probation dated May 24, 2024 ("Def. Ltr.").  To the extent the defendant maintains his objection, the government requests a Fatico hearing in advance of sentencing, at which it will call Victim #1.  Notably, the defendant does not contest that the crew was armed and that a gun was used to perpetrate the robbery.

[2] Any suggestion that the defendant did not himself interact with Baratta and that other members of the crew were simply using his cellular telephone ending in x1952 ("JG Phone") to do so should be dismissed as a far-fetched effort to minimize his role in these crimes.  See Def. Ltr.  The defendant brokered the initial introduction between Baratta and the crew, having himself been introduced to Baratta through a mutual acquaintance ("Subject 1"), whose telephone number the defendant saved in JG Phone as "Russian Victor."  See Gov't Letter to Probation dated June 1, 2024.  Subject 1, in turn, saved the JG Phone number as "John Brooklyn Weed."  Id.  On December 2, 2021, hours before the Brooklyn Robbery & Homicide, Baratta messaged the defendant on the JG Phone, stating, "this is G Victor's boy.  Saw Sean last night hoping they make a move today."  Id.  Notably, Baratta saved the JG Phone number as "Jo," the first two letters of for the defendant's first name, Jonathan.  Id.

2

arranged for the following day at an Airbnb in Brighton Beach, New York (the "Residence"). See id.

On December 2, 2021, at approximately 8:00 p.m., the defendant convened with the crew at a bodega in East New York, New York before they traveled together to Brighton Beach. See id. ¶ 7. The crew departed in a caravan of cars, including a Dodge Caravan registered to the defendant. Id. Certain members of the crew entered the Residence while others, including the defendant, remained lying in wait outside. Id. After midnight, approximately 165 pounds of marijuana were delivered to the Airbnb for the crew to purchase, and which the crew planned to steal. See id. ¶ 8.

On December 3, 2021, at approximately 2:20 a.m., a shootout erupted during the armed robbery, involving at least five guns, two of which were defaced. See id. ¶¶ 9, 12. In the immediate aftermath, Ricketts and Mark Goulbourne fled the Residence holding firearms and dragging a duffle bag of marijuana, as captured in the surveillance footage, screenshots from which are depicted below. See id. ¶¶ 9-10, 12.

 

As further captured on surveillance footage and in telephone records, Mark Goulbourne fled to a nearby intersection, called the defendant on the JG Phone, and moments later entered the defendant's arriving Dodge Caravan. See id. ¶ 9. The defendant then reversed down the street at a high rate of speed, back to the Residence. Mark Goulbourne exited the car, ran to the Residence, opened the door while still holding a firearm, and then fled back to the

3

defendant's car, which sped away. The below photograph depicts Mark Goulbourne returning to the scene still holding a firearm.



In the early morning of December 3, 2021, law enforcement responded to the scene. Id. ¶ 11. They found Baratta unconscious inside the Residence. Id. He had sustained six gunshot wounds from at least two firearms and died that day, id., never having regained consciousness. Victim #4 was also inside the Residence, having sustained a gunshot wound to the leg; he was taken to a hospital for treatment and survived. Id.

Inside the Residence, law enforcement recovered, among other things, a .380 caliber Walther PPK/S pistol and a .40 caliber Beretta Px4 Storm pistol with a defaced serial number; approximately 15 shell casings, from .380, .40 and 9mm ammunition; a money counting machine; a vacuum sealing machine; a large duffle bag of marijuana; and stacks of real and counterfeit currency. Id. ¶ 12. Law enforcement also recovered, in the vicinity of the Residence, among other things, a .40 caliber Sig Sauer SP2340 pistol with a defaced serial number; a .38 caliber Ruger Mayodan pistol; and two more large duffle bags of marijuana. See id. The marijuana inside the three duffle bags collectively weighed approximately 64 kilograms or 141 pounds. Id. The fourth duffle bag, which Mark Goulbourne and Ricketts stole, was never recovered. Id.

On February 10, 2022, the Federal Bureau of Investigation ("FBI") arrested the defendant inside his home in connection with the Brooklyn Robbery & Homicide and seized two of his cellular telephones, including the JG Phone. Id. ¶ 13. The defendant was transported to the FBI's office and taken to an interview room, where his cellular telephones were placed on a table in front of him. Id. He was momentarily left alone in the room, and, during that period, he removed the JG Phone, hid it under the table, and deleted much of its contents, id., including evidence relevant to the investigation. When the FBI asked if they could review the JG Phone, and if it would contain text messages with Mark Goulbourne, the defendant stated that he had deleted everything from the cellular telephone. He initially claimed he had deleted the contents of the JG Phone earlier in the morning, before the arrest, but then admitted he had deleted it

while in the interview room. He falsely claimed he deleted the evidence because he did not want the FBI viewing his lewd photographs. Id. Whereas Baratta's phone reveals messages with the defendant on the JG Phone in the days and hours leading up to the robbery, those messages are deleted from the JG Phone. Id.

B. Procedural History

On February 10, 2022, the defendant was arraigned on a complaint charging him with conspiring to distribute marijuana, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C), in connection with the Brooklyn Robbery & Homicide. ECF No. 15. The defendant was ordered detained pending trial, ECF No. 16, and he has remained detained at the Metropolitan Detention Center ("MDC") since then.

On March 9, 2022, the defendant was indicted for conspiring to distribute marijuana, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C), in connection with the Brooklyn Robbery & Homicide, and obstruction of justice, in violation of 18 U.S.C. § 1512(c), for deleting the contents of the JG Phone following his arrest. See ECF No. 32.

On June 15, 2022, the defendant was charged by superseding indictment with crimes relating to the Bronx Robbery, Staten Island Robbery, and Brooklyn Robbery & Homicide: three counts of Hobbs Act robbery and one count of Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951(a); three counts of distributing and possessing with intent to distribute marijuana and one count of conspiracy to commit the same, in violation of 21 U.S.C. §§ 841(b)(1)(D), 841(b)(1)(C), 841(b)(1)(B)(vii) and 846; one count of brandishing a firearm in furtherance of a crime of violence and drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(ii); and one count of obstruction of justice, in violation of 18 U.S.C. § 1512(c). See ECF No. 54.

On December 21, 2023, the defendant pled guilty before Magistrate Judge Robert M. Levy to obstruction of justice, in violation of 18 U.S.C. § 1512(c). ECF No. 238. On January 9, 2024, Your Honor accepted the defendant's guilty plea. See Minute Entry dated Jan. 9, 2024.

II. Criminal History & Background

The defendant's criminal history reflects a troubling pattern of robbery and other violent offenses, as well as a disregard for court orders.

In January 2007, the defendant violently threatened Latoya Lewis, the mother of his children, at her place of work, in the presence of their three children. He brandished a knife, held it to her neck, and threatened, "I can stab you and kill you right now." When she attempted to call 911, he pushed her and snatched her phone. The defendant was convicted in March 2008 alongside another crime, discussed below. Id. ¶ 38.

In September 2007, the defendant again targeted Ms. Lewis, stealing her handbag from her person, and violated an existing order of protection ("OOP"). In February 2008, he was convicted of Petit Larceny and sentenced to a conditional discharge. Id. ¶ 36.

5

In October 2007, again in violation of an OOP, he followed Ms. Lewis while she was in her car and screamed, "You're a fucking bitch, why are you doing this to me? You're not going to get away with this." When Ms. Lewis arrived at her place of work, he chased her on foot and yelled that she was a "fucking whore." For this conduct, and his actions in January 2007, the defendant was convicted in September 2008 of Criminal Contempt in the Second Degree and Harassment in the Second Degree, among other things, and sentenced to a one-year conditional discharge. In January 2009, a bench warrant was issued, on which the defendant was returned in December 2009. Id. ¶ 38.

In November 2007, again in violation of an OOP, the defendant stole Ms. Lewis's car. In February 2008, he was convicted of Petit Larceny and sentenced to 6 months' imprisonment. Id. ¶ 37.

In March 2010, the defendant was arrested for possessing a switchblade, which he had displayed in plain view. He was convicted of Criminal Possession of a Weapon in the Fourth Degree and sentenced to one day's imprisonment. Id. ¶ 39.

In July 2013, during a fight with his wife Kizzy Goulbourne, the defendant slammed a door on her finger, causing it to break, and causing her to lose her fingertip. An OOP was issued. Id. ¶ 40.

In August 2013, the defendant was found to be in possession of two firearms: a Colt .45 caliber semiautomatic pistol with one round in the chamber and six rounds in the magazine, and a Glock 9mm semiautomatic pistol with one round in the chamber and nine rounds in the magazine. During the defendant's arrest, he attempted to flee, jumped out of a window, and then thrashed his arms to avoid being handcuffed. The defendant was sentenced to 42 months' imprisonment. While in custody, the defendant received two sanctions for disobeying prison orders. Id.

### III.     The Guidelines Calculation

As set forth in the PSR, the applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") calculation is as follows:

| | |
|---|---|
| Base Offense Level (§§ 2J1.2(c)(1), 2X3.1(a)(3)(A), 2A1.1(a)) | 30 |
| Less:  Acceptance of Responsibility (§§ 3E1.1(a)-(b)) | <u>-3</u> |
| Total: | <u>27</u> |

PSR ¶¶ 25-34. The defendant is in Criminal History Category II, and thus his advisory Guidelines range is 78 to 97 months' imprisonment. Id. ¶¶ 41-42, 75.

### IV.     Sentencing Law

The standards governing sentencing are well-established. In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court rendered the Guidelines advisory, and

emphasized that a sentencing court must consider both the Guidelines and the 18 U.S.C. § 3553(a) factors when making a sentencing decision. Id. at 264; see also United States v. Kimbrough, 552 U.S. 85 (2007).

Although the Guidelines are no longer mandatory, they continue to play a critical role in trying to achieve the "basic aim" that Congress sought to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." Booker, 543 U.S. at 252; see also United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that Booker/Fanfan and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge."). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "anchor[s]" the district court's discretion. Molina-Martinez v. United States, 136 S. Ct. 1338, 1345–46 (2016) (internal quotation marks omitted).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in 18 U.S.C. § 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation." United States v. Cavera, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)). Section 3553(a) further directs the Court, "in determining the particular sentence to impose," to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Guidelines; (5) the Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense.

In light of Booker, the Second Circuit has instructed that district courts should engage in a three-step sentencing procedure. See Crosby, 397 F.3d at 103. First, the Court must determine the applicable Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." Id. at 112; see also United States v. Corsey, 723 F.3d 366, 375 (2d Cir. 2013) ("Even in cases where courts depart or impose a non-Guidelines sentence, the Guidelines range sets an important benchmark against which to measure an appropriate sentence."). Second, the Court must consider whether a departure from that Guidelines range is appropriate. See Crosby, 397 F.3d at 112. Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. Id. at 113.

V.      Analysis

The government respectfully seeks an above-Guidelines sentence of 108 to 135 months' imprisonment given the seriousness of the offense conduct, the defendant's history and characteristics, the need to protect the public from further crimes of the defendant, and the need to avoid unwarranted sentencing disparities. As set forth below, the factors set forth in § 3553(a) support such a sentence.

A.      Nature and Circumstances of the Offense, and History and Characteristics of the Defendant

The seriousness of the defendant's offenses cannot be overstated. The defendant committed three armed robberies, each of which involved deadly force, and one of which resulted in murder. Then, the defendant obstructed the murder and robbery investigation by destroying evidence.

The defendant was a critical member of the armed robbery crew. During the Bronx Robbery, he brandished a firearm and pointed it at Victim #1, providing a co-defendant with an opportunity to steal the marijuana. Next, during the Staten Island Robbery, the defendant provided a critical instrument by which to commit the robbery: a large Dodge Caravan he had rented earlier that day, which he himself delivered to the scene, and in which approximately 100 pounds of marijuana were stashed. And in connection with the Brooklyn Robbery & Homicide, he supported each of the key events: he identified the victim, Baratta, and began the process of luring Baratta into the crew's trap; the show and tell in Queens, where he awaited in the vicinity; the planning session at the bodega in East New York, which he attended; and the robbery and homicide in Brighton Beach, where he offered transport and served as a getaway driver for one of the shooters, his brother. Not only did the defendant collect his brother immediately after the shooting, the defendant delivered his brother <u>back</u> to the Residence moments later, which allowed his brother to re-enter the Residence with a firearm still in hand. Time again, the crew's success was dependent on the defendant: to locate a victim; to threaten deadly force against a resisting victim; to secrete the marijuana; and to provide a speedy escape.

The defendant's willingness to brazenly violate the law and obstruct a federal investigation—deleting the contents of the JG Phone after being arrested and while sitting in an FBI interview room—further demonstrates the need for the requested sentence. In so doing, the defendant knowingly destroyed important evidence implicating him and other members of the crew. Indeed, it is beyond dispute that Baratta sent messages to the JG Phone, including in the hours leading up to the Brooklyn Robbery & Homicide, and the defendant's brother repeatedly communicated with the defendant on the JG Phone during the robbery, none of which was reflected in the JG Phone after the defendant deleted its contents.

The defendant's willingness to partner with his co-defendants to commit violent robberies for personal gain, knowing that deadly force would be threatened, and then shamelessly destroy the evidence incriminating them after his arrest, demands a sentence above the advisory Guidelines range.

8

B. <u>The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense</u>

Particularly acute here is the need for the sentence to reflect the seriousness of the offense and to promote respect for the law.  The defendant's actions, together with his co-conspirators, wreaked havoc on neighborhoods in three different boroughs, forever leaving their marks on their victims and—most tragically—leaving a wife without a husband, parents without a son, and children without a father.  Under these circumstances, the requested sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing.

C. <u>The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct</u>

The requested sentence will also accomplish the goals of sentencing by underscoring the significant ramifications that come when criminal actors commit violent robberies using firearms, particularly where—as here—those actions resulted in the death of a victim.  It is undeniable that gun violence runs rampant in New York, particularly in the City's most impoverished neighborhoods.  In 2021 alone, the year of the Brooklyn Robbery & Homicide, over 1,000 deaths were caused by firearms.  <u>See</u> "Firearm Mortality by State," Center for Disease Control and Prevention, https://www.cdc.gov/nchs/pressroom/sosmap/firearm _mortality/firearm.htm (last visited Nov. 11, 2023).  A meaningful term of imprisonment will help deter others who, like the defendant, contemplate using violence for personal gain.

D. <u>The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant</u>

The defendant's lengthy criminal history highlights the need for the requested sentence to deter the defendant himself from further criminal activity.  The defendant's criminal history is marked with firearms and violence.

In the presence of his young children, he threatened their mother, Ms. Lewis, with death while holding her at knifepoint, and took her phone to prevent her from calling for help.  He then stalked and harassed her for months in violation of an OOP.  Similarly, during a fight with his wife Ms. Goulbourne, the defendant slammed her finger in a door, causing her to lose her fingertip.

The defendant's criminal history further reflects escalating weapons offenses.  He was convicted of possessing an illegal switchblade and then, more troublingly, two loaded firearms, both with ammunition in the chamber as well as the magazine.  In other words, the firearms were ready to fire.

Moreover, the defendant's criminal history demonstrates that prior lenient sentences have not deterred him from further criminality.  Given this history, a meaningful term of imprisonment is required to protect the public from further crimes at the defendant's hands.  <u>See</u> <u>United States v. Mishoe</u>, 241 F.3d 214, 220 (2d Cir. 2001) (emphasizing that "a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve").

9

      E.      <u>The Need for the Sentence Imposed to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner</u>

While detained at the MDC, on April 14, 2024, the defendant suffered abdominal pain and nausea, which worsened. PSR ¶ 58. The MDC medical records reflect that on April 15, 2024, he was seen by MDC medical staff and misdiagnosed with gastritis. He was transported to the hospital and received a laparoscopic appendectomy on April 16, 2024. <u>Id.</u> Following his discharge and return to the MDC, on at least one occasion he did not receive his prescribed Percocet and he was unable to complete his prescription of antibiotics. <u>Id.</u>

Although the details of what transpired are the subject of a separate hearing, it is undisputed that the defendant required an appendectomy for acute appendicitis, did not receive at least one day of pain medication post-surgery, and did not complete his antibiotics. In fashioning an appropriate sentencing recommendation, the government took into consideration the likely pain and stress that ordeal caused the defendant.

Considering the serious aggravating circumstances described herein, the government respectfully submits that an above-Guidelines sentence is nonetheless warranted, albeit one reflecting a less significant variance than the government had initially considered. Moreover, the government is not aware of any medical condition from which the defendant is presently suffering that requires treatment.

      F.      <u>The Kinds of Sentences Available and the Need to Avoid Unwarranted Sentencing Disparities</u>

As described in detail above, the § 3553(a) factors make plain that any non-incarceratory sentence would be inappropriate, particularly given the defendant's criminal history, the violence of the offense conduct, and his brazen obstruction of justice.

Moreover, the requested sentence would avoid unwarranted sentencing disparities between similarly situated defendants. On December 11, 2023, Webber was sentenced to 108 months' imprisonment. ECF No. 230. Webber was involved in just one of the charged robberies, the Brooklyn Robbery & Homicide, while the defendant was involved in all three. Further, whereas Webber did not himself possess a firearm to aid the armed robbery crew, the defendant pointed a firearm at Victim #1 during the Bronx Robbery, and was well aware that each of the two subsequent robberies in which he participated would involve the threat of deadly force. Accordingly, a sentence within the defendant's advisory Guidelines range, which would be significantly below the sentence Webber received, would fail to reflect the defendant's respective level of culpability. Indeed, but for the mitigating factor described above, the government's requested sentence would have been meaningfully higher than Webber's sentence.

VI.     Conclusion

        For the reasons set forth above, the government respectfully requests that the Court impose a sentence within the range of 108 to 135 months' imprisonment.

        Respectfully submitted,

        BREON PEACE
        United States Attorney

By:   /s/ Tara McGrath
        Tara McGrath
        Chand Edwards Balfour
        Rebecca Schuman
        Assistant U.S. Attorneys
        (718) 254-7000

cc:    Clerk of the Court (LDH) (by ECF)
        Counsel of Record (by ECF and email)
        U.S. Probation Officer Michelle Malko (by email)