

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

EDP:TBM/CWE/RMS
F. #2022R01073

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 23, 2024

By ECF

The Honorable LaShann DeArcy Hall
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

                Re:     United States v. Romeo Jonas
                        Criminal Docket No. 22-106 (LDH)

Dear Judge DeArcy Hall:

                The government respectfully submits this letter in advance of the defendant Romeo Jonas's sentencing hearing, which is scheduled for September 16, 2024. Jonas has pleaded guilty to Hobbs Act robbery and conspiring to commit the same, in violation of Title 18, United States Code, Section 1951(a), in connection with an armed robbery and homicide in Brooklyn, New York (the "Brooklyn Robbery & Homicide").

                For the reasons stated below, the government requests that the Court impose a sentence of 240 months' imprisonment, followed by a term of supervised release. Such a sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing set forth at 18 U.S.C. § 3553(a).

        I.      Factual & Procedural Background

                A.      Offense Conduct

                Jonas was a member of an armed robbery crew that targeted marijuana dealers throughout New York City. See Presentence Investigation Report dated July 12, 2024 ("PSR") ¶ 5.[1] The crew also included co-defendants Marcus Ricketts, Mark Goulbourne, Jonathan Goulbourne, Chevonne Williams, Amari Webber, and Juvanie Crossgill. Id.

---

        [1]     In addition to the Brooklyn Robbery & Homicide and the robbery in Staten Island described below, the crew perpetrated at least one other armed robbery—in June 2020 in the Bronx—in which Jonas is not believed to have participated.

1.     The Staten Island Robbery

On October 16, 2021, Jonas, along with Ricketts, Mark Goulbourne, Jonathan Goulbourne, and other members of the crew, robbed an individual ("Victim-2") in the vicinity of Victim-2's store in Staten Island during a sham marijuana deal; the crew had negotiated the terms of a marijuana purchase from Victim-2 while intending to (and in fact) robbing Victim-2 (the "Staten Island Robbery").  Id. ¶ 6.  After the crew loaded approximately 100 pounds of marijuana into two of their vehicles, Jonas and other members of the crew held Victim-2 at gunpoint.  Id.  Jonas—who personally brandished a firearm—and his co-conspirators ordered Victim-2 to the floor, threatened to kill him, and robbed him of, among other things, the marijuana, his car, and tobacco merchandise from his store.  Id.

2.     The Brooklyn Robbery & Homicide

In late 2021, Jonathan Goulbourne, on behalf of the armed robbery crew, began negotiating a large-scale sham marijuana deal with an individual ("Victim-3").  PSR ¶ 7.  On December 1, 2021, Ricketts and Mark Goulbourne met with Victim-3 and another individual ("Victim-4") at an apartment in Queens, New York for a "show and tell" of the marijuana that Victim-3 and Victim-4 were offering to sell.  Id.  Ricketts and Mark Goulbourne agreed to purchase the marijuana and arranged to meet the following day to complete the sale.  Id.  In anticipation of the robbery, Jonas, Williams, and Webber traveled from Georgia to New York.

On the evening of December 2, 2021, Jonas, Ricketts, Mark Goulbourne, Jonathan Goulbourne, Williams, Webber, Crossgill, and other members of the crew convened at a bodega in East New York, Brooklyn, id. ¶ 8, where they discussed the robbery plan.  Several hours later, they drove in a caravan of cars to a home in Brighton Beach, Brooklyn (the "Residence") to meet Victim-3 and Victim-4.  Id.  At 10:20 p.m., Ricketts, Mark Goulbourne, and Williams entered the Residence, while Jonas, Jonathan Goulbourne, Webber, Crossgill, and other members of the crew waited in parked cars near the Residence.  Id.

Two hours later, at 12:35 a.m. on December 3, 2021, Victim-4 and two associates brought into the Residence four large duffle bags filled with marijuana that collectively weighed approximately 165 pounds.  Id. ¶ 9.  At 2:06 a.m., Jonas and Webber entered the Residence carrying both real and counterfeit money to use in furtherance of the ruse.  Id. ¶ 10.

Ten minutes later, a shootout erupted inside the Residence involving at least five guns, wounding Victim-4 and killing Victim-3.  Id.  The members of the crew fled the scene, with both Ricketts and Mark Goulbourne brandishing firearms while Ricketts also stole one of the large duffle bags of marijuana.  Id. ¶¶ 10–11.

After the shooting, Jonas went to a hospital in the Bronx, where he checked in using his real name and sought treatment for a gunshot wound to his abdomen.  Id. ¶ 14.  When speaking with law enforcement at the hospital, Jonas falsely claimed that he himself was the victim of a robbery outside a party in the Bronx, which resulted in him being shot.  Law enforcement pursued the false lead.

In the early morning of December 3, 2021, law enforcement also responded to the Residence, where they found Victim-3 unconscious with six gunshot wounds from at least two firearms.  Id. ¶ 12.  Victim-3 was pronounced dead not long after.  Id.  Victim-4 sustained a gunshot wound to his leg, was taken to a hospital for treatment, and survived.  Id.

Inside the Residence, law enforcement recovered, among other things, a .380 caliber Walther PPK/S pistol and a .40 caliber Beretta Px4 Storm pistol with a defaced serial number; approximately 15 shell casings from .380, .40, and 9mm ammunition; a money counting machine; a vacuum sealing machine; three large duffle bags containing approximately 141 pounds of marijuana; and a bag containing both real and counterfeit money.  Id. ¶ 13.

B.   Procedural History

On February 1, 2022, the Honorable Cheryl L. Pollak, United States Magistrate Judge for the Eastern District of New York, issued a warrant for Jonas's arrest in connection with a complaint charging Jonas and others with conspiracy to distribute and possess with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 846, 841(b)(1)(B)(vii).  ECF No. 4.  On February 10, 2022, Jonathan Goulbourne and another co-defendant were arrested and arraigned on this complaint.  See ECF No. 48.  On February 11, 2022, the undersigned received telephone calls and emails from an attorney on behalf of Jonas, asking for the government to provide her with information about the case in an effort to negotiate Jonas's self-surrender.  See id.  After conferring with the attorney, the government did not hear back, and Jonas remained a fugitive.  See id.

On March 9, 2022, a grand jury sitting in the Eastern District of New York, returned an indictment charging Jonas with conspiracy to distribute and possess with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 846, 841(b)(1)(B)(vii).  ECF No. 32.

Approximately four months after the initial arrest warrant was issued, Jonas surrendered to law enforcement.  See ECF No. 48; see also PSR ¶ 16.  On June 13, 2022, he appeared before the Honorable Vera M. Scanlon, United States Magistrate Judge for the Eastern District of New York, who ordered that he be detained pending trial.  ECF No. 73.

On June 15, 2022, a grand jury sitting in the Eastern District of New York, returned a superseding indictment charging Jonas with one count of Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951(a); one count of conspiracy to distribute and possess with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 846, 841(b)(1)(B)(vii); two counts of Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a); and two counts of possession with intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).  ECF No. 60.

On February 1, 2024, Jonas pleaded guilty before the Honorable Robert M. Levy, United States Magistrate Judge for the Eastern District of New York, to Hobbs Act robbery and conspiracy to commit the same pursuant to a plea agreement (the "Plea Agreement").  ECF No. 246.  Under the terms of the Plea Agreement, Jonas acknowledged that he brandished a firearm during the Staten Island Robbery.  Plea Agmt. ¶ 2, n.1.  During the change-of-plea hearing, Jonas

allocated that he "knew . . . that some members of the group were armed and, if necessary, were prepared to use or threaten the use of force to steal the marijuana," and also knew that members of the group had previously committed robberies during which marijuana was stolen." Plea Tr. 24. He also confirmed that, based on his experience with the crew, he understood that a robbery was likely planned for December 2, 2021, and he acted with the intent to contribute to the success of the robbery. Id. at 25.

On February 12, 2024, the Court accepted Jonas's plea of guilty. Cf. ECF No. 248.

C.     Criminal History

Jonas has two prior convictions: a conviction for driving while under the influence of alcohol (misdemeanor) in 2016 and possession of marijuana/disorderly while under the influence (misdemeanors) in 2019. PSR ¶¶ 55–56.

II.     Applicable Law

The Supreme Court has explained that "a district court should begin all sentencing proceedings by correctly calculating the applicable the United States Sentencing Guidelines (the "Guidelines") range. Gall v. United States, 552 U.S. 38, 49 (2007). Though advisory, see United States v. Booker, 543 U.S. 220, 264 (2005), the Guidelines nonetheless are "the starting point and the initial benchmark," Gall, 552 U.S. at 49; see also Molina-Martinez v. United States, 578 U.S. 189, 198–99 (2016) (explaining that "[t]he Guidelines are the framework for sentencing and anchor the district court's discretion" (alternation and internal quotation marks omitted)).

After calculating the applicable Guidelines range, the court must consider the factors outlined in § 3553(a), see Gall, 552 U.S. at 49, and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing," United States v. Cavera, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)). Section 3553(a) directs the court "in determining the particular sentence to impose" to evaluate: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. "[I]n the ordinary case, the [U.S. Sentencing] Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." Kimbrough v. United States, 552 U.S. 85, 109 (2007) (internal quotation marks omitted); see also United States v. Rueda-Zarate, 291 F. App'x 364, 366 (2d Cir. 2008) ("A Guidelines sentence will in the ordinary case 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" (quoting Kimbrough, 552 U.S. at 109)); United States v. Fernandez, 443 F.3d 19, 27 (2d Cir. 2006) ("[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances."). That is because "the sentencing statutes envision both the sentencing judge and the Commission as carrying out

the same basic § 3553(a) objectives, the one, at retail, the other at wholesale." Rita v. United States, 551 U.S. 338, 348 (2007).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988).  Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.

IV.   Discussion

A.   The Guidelines Calculation

As an initial matter, see Gall, 552 U.S. at 49; Molina-Martinez, 578 U.S. at 198–99, the government submits that the Total Offense Level—as reflected in both the PSR and the Plea Agreement—is 40, following the three-point reduction for acceptance of responsibility, see PSR ¶ 53; Plea Agmt. ¶ 2.  Because Jonas falls in Criminal History Category II, see PSR ¶ 58, the resulting Guidelines range is 324 to 405 months' imprisonment, see id. ¶ 92.  Jonas has stipulated to this calculation.  Plea Agmt. ¶ 2.  However, because the statutory maximum sentence for a violation of 18 U.S.C. § 1951(a) is 20 years' imprisonment, Jonas's effective Guidelines range is 240 months.  See U.S.S.G. § 5Gl.l(a).

B.   The § 3553(a) Factors Demand a Significant Term of Imprisonment

The government respectfully submits that consideration of the factors set forth in § 3553(a) supports a sentence of 240 months' imprisonment.

1.   Nature and Circumstances of the Offense

The seriousness of the offenses cannot be overstated and require a substantial incarceratory sentence.  See 18 U.S.C. § 3553(a)(1).

As the Supreme Court has noted, "robbery is a serious crime deserving serious punishment." Enmund v. Florida, 458 U.S. 782, 797 (1982).  This is especially true where, as here, a defendant's conduct recklessly endangers the lives of others, see, e.g., United States v. Pena, No. 14-CR-553 (WFK), 2016 WL 3582045, at *3 (E.D.N.Y. June 28, 2016), not to mention in fact contributes to a loss of life.  Indeed, as this Court observed in sentencing one of Jonas's co-defendants, "[T]here can be no question that this is one of the most serious sorts of crimes" because "[a]ny crime where an individual loses their life is one of the most serious sorts of crimes."  Webber Sent'g Tr. 54–55.

Jonas committed two vicious armed robberies:  one where he personally carried a firearm and threatened to kill Victim-2, and one which resulted in a bloody shootout that led to the murder of Victim-3.

5

During the Staten Island Robbery, Jonas actively participated in the most violent aspect of the sham marijuana deal by holding Victim-2 at gunpoint, threatening to kill him, and completing the robbery.

Knowing firsthand the brutal tactics of the crew's armed robberies, Jonas then participated in the Brooklyn Robbery & Homicide.  On December 2, 2021, his initial role was, with numerous other co-conspirators, to lay in wait around the perimeter of the Residence while three members of the crew ensured that the large amount of marijuana—the target of their planned robbery—was brought into the Residence.  A few hours later, after 165 pounds of marijuana was within arms' reach of his co-conspirators, Jonas entered the Residence with real and counterfeit currency to play his part in the sham deal, knowing that members of the crew were armed and prepared to use force to take the marijuana.  He thus not only served as manpower for the crew but also took active steps to further the robbery.

The shootout that ensued shortly thereafter—killing Victim-3 and wounding Victim-4—was entirely foreseeable to him. As this Court previously observed in this case, "[W]hen you are talking about people carrying guns, it is impossible for that force to not potentially include the loss of life.  It was all foreseen."  Id. at 55.  Jonas himself allocuted that he was well aware that his co-conspirators were armed and that they were prepared to use force during the Brooklyn Robbery & Homicide.  Indeed, he was intimately aware of the crew's tactics given his involvement in Staten Island Robbery, in which he personally brandished a firearm while robbing Victim-2.

Jonas's repeated willingness to partner with his co-conspirators to commit violent robberies for personal gain demonstrates the appropriateness of the requested sentence.  That he was not himself one of the shooters at the Brooklyn Robbery & Homicide does not warrant a downward departure or variance because that fact is already reflected in the offenses of conviction and applicable statutory penalties.  In contrast to some of his co-defendants, Jonas has not been charged with the unlawful discharge of a firearm (which carries a mandatory, consecutive term of imprisonment of 10 years) or causing death through use of a firearm (which carries a statutory maximum term of imprisonment of life).  Rather, he has been convicted of conspiring to commit and committing Hobbs Act robbery, and the effective Guidelines range appropriately accounts for his role in the above-described crimes.

   2.   History and Characteristics of the Defendant

Nothing about Jonas's history and characteristics suggest that a below-Guidelines sentence is warranted.  See 18 U.S.C. § 3553(a)(1).

For one, while his prior criminal record is limited, the applicable Guidelines calculation already accounts for that fact, which should not be double counted as a basis for a downward variance or departure.  Rather, Jonas's conduct following his detention in this case bears mention, given that he was found in possession of contraband at the Metropolitan Detention Center ("MDC") in February 2024, PSR ¶ 74, just weeks after pleading guilty in this

6

case.[2]  Specifically, officials located a cellular telephone and a dangerous weapon—the 7.5-inch sharpened metal weapon shown below—in the locker assigned to Jonas, where he also stored his prescription medication bottles and mail.



A weapon like this is only possessed by someone with violent intentions, but the danger posed by contraband cellular telephones themselves cannot be overstated, as such devices can be used to facilitate serious criminal acts from within correctional institutions, from arranging escapes to coordinating kidnappings to tampering with witnesses.  See, e.g., United States v. Blake, 288 F. App'x 791, 794 (3d Cir. 2008) (noting that "the risks presented when inmates possess cell phones. . . are patent," to include "notify[ing] someone on the outside when they're traveling," "intimidat[ing] witnesses," and "try[ing] to send someone after [an] employee" (internal quotation marks omitted)); Green v. Keyser, 2017 WL 5125533, *11 (S.D.N.Y. Nov. 1, 2017) (explaining  that "cell phones [in correctional facilities] would allow a number of things to occur that would present a risk, [including] an escape plan, injury, or carrying on criminal activity from inside the institution" (internal quotation marks omitted)).  Indeed, as one district court explained, "[t]he potential for criminality is large" and includes "orchestrating assaults on other inmates, planning contraband drug sales within the prison, ordering the transfer of drug proceeds in outside accounts, surveillance of other inmates, carrying out a criminal conspiracy, and doing all of the above while avoiding detection by prison guards."  United States v. Garibay, 2015 WL 468404, *3 (S.D. Cal. Feb. 3, 2015).

　　　　To the extent Jonas would argue for leniency by virtue of his need to parent his children, his particular circumstances show that any such argument should be rejected.  Cf. United States v. Faria, 161 F.3d 761, 762 (2d Cir. 1998) (emphasizing that "a district court may

---

[2]　　　　To the extent Jonas requests a downward variance or departure based on representations about the conditions during his incarceration at MDC, the Court should not only bear in mind that his own misconduct has contributed to those conditions but also focus on how any such how conditions have affected him personally.  See United States v. Idris Dayo Mustapha, No. 23-CR-440 (E.D.N.Y. May 1, 2024), Sent'g Tr. 33–34 (noting that Court is "not going to be convinced by general descriptions of the conditions at the facility or in the BOP system writ large that a variance is warranted for any particular defendant; rather, I am looking at how those conditions have affected the [] conditions of the incarceration experienced by this defendant.").

depart on the basis of family circumstances <u>only</u> in exceptional circumstances" (emphasis added)).  Jonas has fathered four children with three different women, <u>see</u> PSR ¶¶ 69–71, but the PSR is silent as to his financial support of his three most recent children, <u>see</u> <u>id.</u> ¶¶ 70–71, and indicates that he was not residing with any of his children—<u>i.e.</u>, was not the sole or primary caretaker—prior to his arrest, <u>see</u> <u>id.</u> ¶ 73.  While it is admirable that he has maintained relationships with his children during the pendency of this case, it bears emphasis that he was a parent at the time of both Staten Island Robbery and the Brooklyn Robbery & Homicide.  Clearly, his familial obligations did nothing to induce him to maintain a law-abiding life then, and there is nothing to suggest it will do so now.  Furthermore, the unfortunate consequences of his criminal conduct on his children were entirely foreseeable to Jonas; it was Jonas and Jonas alone who made the choices to violate the law in a way that has placed him at risk of a significant term or imprisonment.  See <u>United States v. Al Kassar</u>, No. 07-CR-354 (JSR), 2020 WL 4813199, at *2 (S.D.N.Y. Aug. 19, 2020) ("[W]hile the [c]ourt is cognizant of the burden imposed by defendant's inability to see his loving family, anyone who commits as serious a crime as this defendant must know in his heart that if he is caught and imprisoned, it is his own family who may suffer the worst."); <u>cf.</u> <u>United States v. Sorenson</u>, 233 F. Supp. 3d 690, 703 (S.D. Iowa) (underscoring that the "[d]efendant cannot escape an otherwise just sentence by propping up his family to invoke undue sympathy"), <u>aff'd</u>, 705 F. App'x 481 (8th Cir. 2017).

3.     <u>The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense</u>

Particularly acute here is the need for the sentence to reflect the seriousness of the offenses, to promote respect for the law, and to provide just punishment for the offense.  See 18 U.S.C. § 3553(a)(2)(A).  Jonas's actions, together with his co-conspirators, wreaked havoc on residential neighborhoods in Staten Island and Brooklyn, then left a wife without a husband, a mother without a son, and children without a father.  Under these circumstances, the requested sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing.

4.     <u>The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct</u>

A significant term of imprisonment also would accomplish the goals of sentencing by underscoring the significant ramifications that come when criminal actors commit violent robberies using firearms, which here escalated to murder.  See 18 U.S.C. § 3553(a)(2)(B).  It is undeniable that gun violence runs rampant in New York, particularly in the City's most impoverished neighborhoods.  In 2022 alone, over 1,000 deaths were caused by firearms.  See "Firearm Mortality by State," Center for Disease Control and Prevention, <u>available at</u> https://www.cdc.gov/nchs/pressroom/sosmap/firearm _mortality/firearm.htm (last visited Aug. 15, 2024).  A meaningful term of imprisonment will serve to deter others who, like Jonas, contemplate using violence for personal gain.

     5.    <u>The Need for the Sentence Imposed to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner</u>

There is no needed educational or vocational training, medical care, or other correctional treatment that would warrant a below-Guidelines sentence in this case. <u>See</u> 18 U.S.C. § 3553(a)(2)(D).

Jonas was diagnosed with asthma during childhood and uses an inhaler to treat that condition. PSR ¶ 76. Additionally, as self-reported by Jonas, he continues to suffer from blood in his bowel movements due to the gunshot wound he sustained during the course of the Brooklyn Robbery & Homicide. <u>Id.</u> ¶ 77. There is no indication that either condition cannot be addressed in a Bureau of Prisons facility. <u>See id.</u> ¶¶ 76–77.

Nor does the need for vocational training. As outlined in the PSR, Jonas is college-educated and opened his own business in Georgia. <u>Id.</u> ¶¶ 80, 82, 84. There were obvious, lawful avenues available to him to work and earn money, but he instead chose violence.

     6.    <u>The Need to Avoid Unwarranted Sentencing Disparities</u>

The requested sentence of 240 months' imprisonment would not create any unwarranted sentencing disparities. <u>See</u> 18 U.S.C. § 3553(a)(6). As the Second Circuit has made clear, the appropriate inquiry under § 3553(a)(6) is "among <u>similarly situated</u> defendants" and not simply "disparity among co-defendants." <u>United States v. Kanagbou</u>, 726 F. App'x 21, 25 (2d Cir. 2018) (emphasis added)).

To date, two of Jonas's co-defendants have been sentenced by this Court. While each was sentenced to a term of imprisonment below the 240 months requested here, there are significant differences among these co-conspirators that render them dissimilarly situated.

On November 29, 2023, the Court sentenced Webber to 108 months' imprisonment following his convictions for Hobbs Act robbery and conspiracy to commit the same. ECF No. 230. Notably, unlike Jonas, Webber was involved only in the Brooklyn Robbery & Homicide, did not possess or brandish a firearm in connection with the efforts of the crew, and fell within Criminal History Category I. <u>See</u> ECF No. 212. In 2018, Webber committed a violent kidnapping with Mark Goulbourne, for which he later pled guilty, that case was prosecuted in the state and the subject of separate sentence. <u>See id.</u>

On June 14, 2024, the Court sentenced Jonathan Goulbourne to 80 months' imprisonment following his conviction for obstruction of justice. ECF No. 371. Jonathan Goulbourne was involved in each of the three armed robberies charged in this case. Unlike Jonas, however, Jonathan Goulbourne did not commit violence: he did not threaten a victim with death or brandish a firearm. Moreover, and most starkly, Jonathan Goulbourne suffered an acute medical situation while incarcerated at MDC, <u>see</u> ECF No. 357, which the Court took into consideration when imposing his sentence.

V.     Conclusion

For the reasons set forth above, the government respectfully requests that the Court impose a sentence of 240 months' imprisonment, followed by a term of supervised release.

Respectfully submitted,

BREON PEACE
United States Attorney

By:      /s/ Rebecca Schuman
Rebecca Schuman
Chand Edwards Balfour
Rebecca Schuman
Assistant U.S. Attorneys
(718) 254-7000

cc:    Clerk of the Court (LDH) (by ECF)
Murray Singer, Esq. (by ECF and email)
U.S. Probation Officer Michelle Malko (by email)