**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

    -against-

JONATHAN GOULBOURNE,

                   Defendant.

Case No. 22-CR-00106 (LDH)

**PROPOSED FINDINGS OF**
**FACT FROM JANUARY 13, 2025**
**EVIDENTIARY HEARING**

Non-parties Federal Bureau of Prisons "("BOP"), Bruce Bialor, M.D., Marilyn Garcia, Blake Glucksnis, and Elizabeth Lynch (collectively and excluding BOP, the "BOP Employees"), by their undersigned attorneys, respectfully submit the following proposed findings of fact in connection with the collateral proceedings before this Court concerning medical care provided to defendant Jonathan Goulbourne in or around April and May 2024 while he was detained at the Metropolitan Detention Center ("MDC"), 80 29th Street, Brooklyn, New York 11232.

## Preliminary Statement

The evidentiary hearing showed that Mr. Goulbourne received adequate treatment for his appendicitis and that MDC staff acted in good faith in responding to his counsel's inquiries.

Six hours after Mr. Goulbourne first presented to the MDC medical staff, on the morning of April 15, 2024, with complaints of abdominal pain, the Clinical Director of the MDC, Dr. Bruce Bialor, determined that Mr. Goulbourne had symptoms consistent with appendicitis and sent him to the emergency room. Examinations at the MDC and in the NYU Langone/Brooklyn emergency room revealed that he was in no apparent distress, did not have a fever, and was

1

negative for other significant symptoms.  NYU Hospital determined that any surgery could wait until the next day.

The next day doctors at the Brooklyn Hospital Center performed a laparoscopic appendectomy, in which the appendix is removed by making a small incision in the abdomen. The medical records reflect that it was an uncomplicated procedure.  Mr. Goulbourne did not have a ruptured appendix — which could not have been removed laparoscopically.  The MDC medical staff knew from his discharge paperwork that Mr. Goulbourne did not have a ruptured appendix.

Although the hospital did not recommend antibiotics for Mr. Goulbourne upon his discharge on April 18, after examining Mr. Goulbourne upon his return to the MDC and noting redness around his incision, Dr. Bialor ordered a five-day course of antibiotics, prescribing a dosage of two capsules a day for five days, for a total of 10 pills.  Dr. Bialor also prescribed a three-day course of oxycodone with acetaminophen, also known as Percocet, a narcotic pain medication, in a dosage of two pills per day.[1]

Mr. Goulbourne received his first dose of each medication upon his return from the hospital on April 18.  As a result, he had nine doses of the antibiotic remaining when he left the Medical Unit on April 18.  Nonetheless, Dr. Bialor's order for 10 capsules was filled as written. The full course of 10 capsules was delivered to Mr. Goulbourne to self carry sometime on April 19.  If he took the remaining nine pills as directed, he would have completed his full course of antibiotics, at the latest, on the afternoon of April 23.  If his antibiotic self-carry bag accidentally did not transfer with Mr. Goulbourne to the Special Housing Unit ("SHU") that afternoon, the

_____

[1] Our proposed findings of fact refer to this prescription throughout as Percocet for ease of reference, but Mr. Goulbourne may have been prescribed the generic version of the medication.

result was that he missed at most one dose of the antibiotic. When Ms. Marilyn Garcia ("Nurse Garcia") encountered Mr. Goulbourne on her SHU rounds on April 24 and asked him if he needed anything, he said no.

The Percocet was delivered to Mr. Goulbourne through the pill line in accordance with BOP rules, and when he complained of breakthrough pain, he was given additional medication (Tylenol). Mr. Goulbourne's three-day Percocet regimen, if taken as directed, would have ended two days before Mr. Goulbourne was transferred to the SHU.

On the afternoon of April 24, 2024, Mr. Goulbourne's defense counsel contacted the MDC Legal Department (the "Legal Department") claiming that his client, who was in the SHU, was recovering from a "ruptured appendix" and faced an allegedly "life-threatening" situation if he was not given his antibiotics immediately. The Legal Department promptly contacted pharmacy, medical, and health services administration staff to investigate. By the morning of April 25, pharmacy and health services staff informed the Legal Department that Mr. Goulbourne had been given 10 pills of an antibiotic on April 19, that he had been medically examined by staff that day (April 25), and that the examination showed his surgical incision had healed. The email from the health services administration staff concluded with the definitive statement, "Treatment completed." The Legal Department so informed defense counsel the following day (April 26).

The emails exchanged by and with defense counsel about Mr. Goulbourne's antibiotics gave rise to two misunderstandings, however, although they did not affect Mr. Goulbourne's treatment. First, there was a misunderstanding over what defense counsel was asking. Whereas the pharmacy, health services, and Legal Department staff initially believed themselves to be addressing whether Mr. Goulbourne had received his antibiotic medication at all (he had), defense counsel intended to raise the different question of whether Mr. Goulbourne's antibiotic

3

(or whatever doses of it might be left) had followed Mr. Goulbourne to the SHU. Once defense counsel clarified the issue, the Legal Department went back to further investigate. The second misunderstanding concerned a date calculation. Pharmacy staff advised the Legal Department that, had Mr. Goulbourne taken his antibiotic correctly, he should have finished all doses before he was sent to SHU on April 24 — but that calculation provided to the Legal Department was off by half a day, because Mr. Goulbourne was transferred the afternoon of April 23, not April 24. No one in the Legal Department caught that error. The Staff Attorney who was tasked with responding to defense counsel was brand new to her role and had not yet been trained on how to access MDC's SHU records, or on how respond to external inquiries like the one from Mr. Goulbourne's counsel. Acting reasonably and in close consultation with Legal Department colleagues, and certainly not with the intent to make any misrepresentations, the Staff Attorney sent two email replies to defense counsel that hewed closely to the information provided to her by the pharmacy and health services administration staff.

Notwithstanding those misunderstandings over a period of several days, the record shows that Mr. Goulbourne received adequate medical care throughout. If Mr. Goulbourne missed one dose of his course of antibiotics — which is unclear from the record — it had no consequences for him. As of May 2, 2024, both Dr. Bialor and an independent physician who examined Mr. Goulbourne at the Court's direction determined that no further antibiotics were indicated to make up for the single dose he allegedly missed.

This is the capsule summary of what the record (detailed below) shows. What is abundantly clear is that everyone acted in good faith. Accordingly, we respectfully submit that the Court should declare its inquiry closed.

**Proposed Findings of Fact**

**A. Mr. Goulbourne's Initial Complaints and BOP's Response**

1.      Mr. Goulbourne was first examined for complaints of abdominal pain on April 15, 2024, at 7:52 a.m. by an MDC nurse.  (Transcript of Criminal Cause for Evidentiary Hearing Before the Honorable LaShann DeArcy Hall, United States District Judge, on January 13, 2025 ("Tr.") 16:7-15; Ex. MDCX-A (notes of the Clinical Encounter on April 15, 2024 at 7:52 a.m.) at DNJ0095.)[2]  The examination took place shortly after Mr. Goulbourne began experiencing abdominal pain, which was allegedly in the early morning hours on April 15, 2024.  (Tr. 94:5-11; Ex. MDCX-D-2 at DNJ0136 (Brooklyn Hospital Center General Surgery Admission H&P [History and Physical] Note stating "Patient states that he began to have periumbilical pain around 12AM Sunday evening;" Sunday was April 14, 2024); *see also* MDCX-C at DNJ0150 (notes of examination at NYU Langone hospital on 4/15/24 at 10:34 p.m. ("presents with 1 day of RLQ [Right Lower Quadrant] pain after large dinner yesterday").)

2.      There is no evidence in the MDC medical records to support Mr. Goulbourne's claim that he made a request to see medical staff on April 14, 2024.  (Tr. 54:5-10; Ex. MDCX-A.)

3.      At the time of the examination on April 15th at 7:52 a.m., Mr. Goulbourne "present[ed] in no apparent distress, resting on his bed" in his housing unit.  (Tr. 16:25-17:2; Ex. MDCX-A at DNJ0095.)  He "[a]ppear[ed] Well, Alert and Oriented x 3."  (Ex. MDCX-A at DNJ0095.)

---

[2] We understand that the Court already has all exhibits from the January 13 Hearing.  Should the Court wish us to provide an additional set to accompany our proposed findings of fact, we will be glad to do so.

4.      There is no evidence to support Mr. Goulbourne's claim that he collapsed during the night of April 14th due to his symptoms.  (Tr. 55:17-20.)  That claim is inconsistent with how he presented at his examination at 7:52 a.m. on April 15th and how he presented at his subsequent examinations on April 15th both at the MDC and later at NYU-Langone Hospital – Brooklyn and early on April 16th at The Brooklyn Hospital Center, as discussed further below.  (Ex. MDCX-A at DNJ0095; MDCX-C (examination at NYU Langone Hospital – Brooklyn on April 15, 2024, at 10:31 p.m.) at DNJ0150 ("Denies diarrhea, constipation, fevers, chills, or changes in urination."); *id.* at DNJ0151 (on examination, Mr. Goulbourne was "Negative for activity change, appetite change, chills, fatigue and fever"); *id.* ("He is not in acute distress."); *id.* at DNJ0152 ("Mood normal"); Ex. MDCX-D-2 (Records from Brooklyn Hospital admission on April 16, 2024, just prior to surgery) at DNJ0136 ("Patient denies any nausea, dysuria, fevers, chills, constipation, or diarrhea . . . "); *id.* at DNJ0137 ("Resting comfortably in bed.  NAD [No apparent distress.]").)  Moreover, if Mr. Goulbourne collapsed during the night of April 14th, Dr. Bruce Bialor, Clinical Director of the MDC, was not aware of it.  (Tr. 55:17-20.)

5.      At the time of Mr. Goulbourne's examination on April 15th at 7:52 a.m. it was not apparent that he had appendicitis because there are multiple conditions that can cause the symptoms Mr. Goulbourne complained of at that time, which were abdominal pain, vomiting "earlier in the evening," and alleged swelling of his lymph nodes.  (Tr. 17:6-12; Ex. MDCX-A at DNJ0095.)

6.      Far from ignoring Mr. Goulbourne's complaints, the nurse who saw Mr. Goulbourne at his examination in the morning on April 15th scheduled him to be seen later that same day at "sick call," which is when a patient is seen by a provider for further evaluation.  (Tr. 17:17-25; Ex. MDCX-A at DNJ0095.)

7.     Mr. Goulbourne was next seen only six hours later, on April 15, 2024, at 1:41 p.m. (Tr. 18:1-9; Ex. MDCX-B (notes of the Clinical Encounter on April 15, 2024, at 13:41).) He was examined at the MDC health services unit by Dr. Bruce Bialor as well as by the nurse practitioner and the staff physician at the MDC. (Tr. 18:16-18; Ex. MDCX-B.) Dr. Bialor, who has a specialty in internal medicine, has been clinical director at the MDC since June 2020. (Tr. 14:18-19; 15:1-5.) Prior to that he was acting clinical director at the MDC from June 2017 through June 2020, and medical officer at MDC from September 2015 through June 2017. (Tr. 15:3-12.)

**B.  BOP's Determination to Send Mr. Goulbourne to the Hospital and the Hospital's Assessment**

8.     At the examination, Dr. Bialor determined that Mr. Goulbourne should be sent to a hospital emergency room because he was having severe abdominal pain and had tenderness in the right lower quadrant that was suggestive of appendicitis or some other acute abdominal condition that would require emergency attention. (Tr. 18:19–19:5; Ex. MDCX-B at DNJ0093.) Mr. Goulbourne did not have a fever. (Ex. MDCX-B at DNJ0092.)

9.     Mr. Goulbourne was sent to the emergency room nearest to the MDC, which was NYU Langone Hospital – Brooklyn. (Tr. 19:6-8; Ex. MDCX-C (medical records from NYU Langone – Brooklyn).) At NYU-Langone Mr. Goulbourne was diagnosed with a "dilated appendix without perforation or abscess." (Tr. 19:23–20:7; Ex. MDCX-C at DNJ0150.) He did not have a ruptured appendix. (Tr. 20:22–21:1.) A dilated appendix is not the same thing as a ruptured appendix. (Tr. 20:22-24.)

10.     At the time of his examination at NYU-Langone Hospital on April 15, 2024, Mr. Goulbourne was "not in acute distress." (Tr. 21:12-15; Ex. MDCX-C at DNJ0151.) He had no change in his activity level, no chills, fatigue, or fever, and no cough, shortness of breath, or

7

choking.  (Tr. 21:5-11; Ex. MDCX-C at DNJ0151.)  Mr. Goulbourne acknowledged to the

examining physician that he had only been feeling ill for one day.  (Tr. 21:16-19; Ex. MDCX-C

at DNJ0150.)  These findings are inconsistent with Mr. Goulbourne's claim that he "collapsed"

on the night of April 14th and that he failed to receive proper attention to his medical condition at

the MDC prior to his surgery.

       11.     On examination at NYU-Langone Hospital, Mr. Goulbourne had no abdominal

distension.  (Tr. 21:20–22:1; Ex. MDCX-C at DNJ0151.)  His abdomen was flat.  (*Id.*)

**C.  Mr. Goulbourne's Laparoscopic Surgery and Discharge from the Hospital**

       12.     Mr. Goulbourne's condition at the time of his examination was not so acute that

NYU Langone – Brooklyn needed to perform an emergency appendectomy on Mr. Goulbourne

on arrival at the hospital.  (Tr. 22:2-6; Ex. MDCX-C at DNJ0150 (Mr. Goulbourne was "stable

for transfer"); DNJ0153 (same).)  In fact, NYU Langone – Brooklyn transferred Mr. Goulbourne

to The Brooklyn Hospital Center at 121 De Kalb Avenue in Brooklyn ("Brooklyn Hospital") for

the surgery, which was performed in the early morning on April 16, 2024.  (Tr. 22:16-21; Ex.

MDCX-D-2 at DNJ0137.)

       13.     The surgery was a laparoscopic appendectomy.  (Tr. 23:1-1-4; Ex. MDCX-D-1 at

DNJ0133.)  A laparoscopic appendectomy is performed by making a small incision in the

abdomen to remove the appendix without a full incision that would require a longer recovery

time.  (Tr. 23:5-10.)  A laparoscopic appendectomy is a much less invasive method of

performing an appendectomy than a full incision appendectomy.  (*Id.*)  A ruptured appendix

cannot be treated by laparoscopic surgery.  (Tr. 23:11-13.)

       14.     The surgery was uncomplicated, as indicated in the Brooklyn Hospital records.

(DNJ0222 (Brooklyn Hospital records produced by Mr. Goulbourne stating that Mr. Goulbourne

had a "laparoscopic appendectomy for acute uncomplicated appendicitis"); *see also* DNJ0346

(stating that Mr. Goulbourne had symptoms "compatible with mild appendicitis").)[3]  The single

reference in the Brooklyn Hospital records that contains the word "complicated" was a

transcription error.  (Tr. 85:22–86:11, 91:12–92:4.)  Contrary to Mr. Goulbourne's claim, there

was no perforation or abscess of the appendix.  (Ex. MDCX-C at DNJ0155 (CT scan showing

"No evidence for perforation or abscess formation.").)

15.    At his discharge from Brooklyn Hospital on April 18, 2024, the hospital

recommended two medications for Mr. Goulbourne — Percocet for pain relief and Colace, a

stool softener.  (Tr. 23:17-21; Ex. MDCX-D-2 at DNJ0141.)

16.    The hospital did not recommend an antibiotic for Mr. Goulbourne.  (Tr. 23:22-23;

MDCX-D-2 at DNJ0141.)

17.    Mr. Goulbourne was not given any medication to take with him when he left the

hospital.  (Tr. 23:24–24:9.)  Adults in custody at MDC typically are not given medications to

take with them when they are discharged from a hospital because the MDC has an in-house

pharmacy that dispenses medications.  (Tr. 24:2-9.)

18.    Specifically, Brooklyn Hospital recommended the following medications for Mr.

Goulbourne: (1) Percocet – 1 tablet with 10 mg oxycodone and 325 mg acetaminophen orally

every 8 hours for 2 days and (2) Colace, a stool softener, once a day for 14 days.  (Ex. MDCX-

D-2 at DNJ0141.)

---

[3] There are three instances in which these proposed findings of fact reference documents Bates-stamped
"DNJXXXX."  Counsel for Mr. Goulbourne and for the non-parties had access to these records before the
January 13 Hearing, whether because they were produced by counsel for Mr. Goulbourne (Brooklyn
Hospital Records) or by BOP (SHU tickets).  Counsel for BOP will produce the entirety of the records to
the Court for the Court's convenience.

**D. Medical Care Provided to Mr. Goulbourne Upon his Return from the Hospital to the MDC on April 18, 2024**

19.     Mr. Goulbourne returned to the MDC from the hospital on April 18, 2024, two days after he underwent the laparoscopic appendectomy on April 16, 2024.  (Tr. 100:10–101:3; Ex. MDCX-F at DNJ0084; Ex. MDXC-D-1 at DNJ0130.)

20.     Upon arrival at the MDC, Mr. Goulbourne was met by Nurse Garcia.  (Tr. 100:10–101:3.)  Nurse Garcia is a registered nurse with Associate's and Bachelor's degrees in nursing.  She has been employed as a nurse at the MDC since November 2013.  (Tr. 99:16-23.)

21.     Upon meeting Mr. Goulbourne in the MDC's receiving and discharge unit upon his return from the hospital, Nurse Garcia looked at Mr. Goulbourne's discharge paperwork.  She learned from the discharge paperwork that Mr. Goulbourne had been in the hospital for acute appendicitis.  (Tr. 101:4-24, 102:12-14; Ex. MDCX-D-1 at DNJ0130.)

22.     There was no indication in the hospital discharge paperwork that Mr. Goulbourne had a ruptured appendix.  (Tr. 102:5-7; Ex. MDCX-D-1 (all pages).)

23.     After reviewing Mr. Goulbourne's discharge paperwork, Nurse Garcia examined Mr. Goulbourne's surgical incision and noticed something shiny that concerned her.  She called Dr. Bialor and asked to have Mr. Goulbourne taken to the Medical Unit.  Thereafter, Mr. Goulbourne was taken to the Medical Unit.  (Tr. 102:12-25.)

24.     In the Medical Unit, Dr. Bialor and Nurse Garcia examined Mr. Goulbourne.  (Tr. 25:5-24, 103:3-5; Ex. MDCX-F.)  The examination took place at approximately 3:27 p.m.  (Ex. MDCX-F at DNJ0085.)

25.     Upon examining Mr. Goulbourne, Nurse Garcia discerned that the shiny substance was incision glue.  (Tr. 103:6-9.)  This glue serves as a liquid band-aid solution to seal the skin edges and promotes healing.  (Ex. MDCX-F at DNJ0085.)

10

26.    Dr. Bialor and Nurse Garcia observed that Mr. Goulbourne had some redness on one of the incisions, which suggested a possible mild post-operative wound infection.  (Tr. 25:19–26:7, 103:3-12; Ex. MDCX-F at DNJ0085.)

27.    There was no drainage or swelling in the area of Mr. Goulbourne's incision.  (Tr. 103:13-21; Ex. MDCX-F at DNJ0085.)

28.    Nurse Garcia marked the area of the redness with a marker and told Mr. Goulbourne that if the redness spread beyond the marked area he should notify the medical staff immediately.  (Tr. 103:22–104:2.)  Mr. Goulbourne acknowledged that he understood the instruction.  (Tr. 104:3-4.)

29.    Based on the redness on Mr. Goulbourne's incision, Dr. Bialor ordered an antibiotic for him.  (Tr. 26:3-7.)  Specifically, Dr. Bialor ordered a five-day course of Cephalexin, also referred to as Keflex.  (*Id.*)  The prescribed dosage was two capsules per day for five days, for a total of 10 pills. (Tr. 26:8-9, 104:5–105:3; Ex. MDCX-F at DNJ0085.)

30.    Dr. Bialor also ordered a three-day course of Percocet, a pain medication that combines oxycodone with acetaminophen, for Mr. Goulbourne, with a dosage of two tablets twice per day.  (Tr. 26:10-21, 105:8-11; Ex. MDCX-F at DNJ0085.)

31.    Dr. Bialor's prescription for Mr. Goulbourne for Percocet was slightly different from the prescription recommended by Brooklyn Hospital in that Dr. Bialor's prescription was for the same dose but twice a day for three days rather than three times a day for two days.  (Tr. 26:22–27:6; Ex. MDCX-F at DNJ0085.)  The reason was that Percocet, as a controlled substance, has to be dispensed at the MDC on the "pill line," which only takes place twice a day. (Tr. 27:7–28:4; Ex. MDCX-F at DNJ0085-86.)  Adults in custody are not permitted to carry controlled substances with them at the MDC.  (Tr. 27:11-13, 27:24–28:3.)

11

32. The "pill line" is when pharmacy/medical staff go to the individual housing units and dispense the controlled substances to the adults in custody that have been prescribed them on those floors. (Tr. 27:10–28:1.) There are two pill lines per day; one in the morning and one in the afternoon/evening. (Tr. 27:2-3, 59:5-8; Ex. MDCX-H.)

33. At the examination of Mr. Goulbourne on April 18, 2024, Dr. Bialor directed Nurse Garcia to give Mr. Goulbourne a "stat dose" of each medication, meaning, to give Mr. Goulbourne the first dose of each medication then and there. (Tr. 28:18–30:16, 105:12-20; Ex. MDCX-F at DNJ0085.)

34. In accordance with Dr. Bialor's instruction, Nurse Garcia gave Mr. Goulbourne his first dose of both the antibiotic and the Percocet while he was at the Medical Unit on the afternoon of April 18, 2024. (Tr. 28:25–29:11, 105:19-20; Ex. MDCX-F at DNJ0085 ("stat dose given").)

35. Nurse Garcia obtained those initial doses from a dispensing machine in the Medical Unit known as Pyxis. (Tr. 107:21–108:2.) Exhibit X reflects Nurse Garcia's retrieval from Pyxis of the initial doses of Cephalexin and Percocet Nurse Garcia gave to Mr. Goulbourne on the afternoon of April 18, 2024. (Tr. 108:20–109:5; Ex. MDCX-X.)

36. When she gave Mr. Goulbourne his initial dose of the antibiotic Nurse Garcia had a "big conversation" with him. (Tr. 122:21-24.) She told Mr. Goulbourne that if he saw any signs of infection or anything he thought needed to be addressed by the medical staff he should let her know. She told him that if he didn't get his medication to let the medical staff know immediately. (Tr. 123:4-8.)

37. The first dose Nurse Garcia gave Mr. Goulbourne on April 18 counted toward the full 10-pill course of the antibiotic. (Tr. 29:25–31:13, 31:25–32:9, 109:13-23.) Thus, when he

12

left the Medical Unit on the afternoon of April 18, Mr. Goulbourne's remaining course of antibiotics consisted of nine capsules. (*Id.*) Since he was nonetheless given a packet of 10 pills on April 19th, Mr. Goulbourne was given one extra pill beyond the 10-pill prescription. (Tr. 29:25–31:13; Ex. MDCX-G (Medications Summary for Mr. Goulbourne) at DNJ0116.)

38.    Exhibit MDCX-F is Nurse Garcia's contemporaneous medical note of her encounter with Mr. Goulbourne in the Medical Unit on the afternoon of April 18, 2024. (Tr. 107:3-11.) The note accurately reflects Nurse Garcia's interaction with Mr. Goulbourne and the steps she took. (Tr. 107:15-20.)

39.    Nurse Garcia completed her medical note on April 18, 2024, at 4:01 p.m. (Ex. MDCX-F at DNJ0086.) By closing her medical note, Nurse Garcia automatically sent Mr. Goulbourne's prescriptions for the Cephalexin and Percocet to the MDC pharmacy. (Tr. 106:12-21; 107:12-14.) Nurse Garcia did not alter the Cephalexin prescription for 10 capsules to account for having given Mr. Goulbourne the initial dose, nor was she authorized to do so. (Tr. 110:7-16.)

40.    The antibiotic was a self-carry medication. (Tr. 28:5-14, 109:24–110:6.) Self-carry medications are those for which the full course of the medication is delivered to the inmate in a regular prescription bottle within a small self-carry bag. (Tr. 28:5-14.) Nurse Garcia never heard from Mr. Goulbourne or anyone else that Mr. Goulbourne failed to receive his self-carry bag of antibiotics on April 19, 2024. (Tr. 111:21-23.)

41.    As noted above, Mr. Goulbourne got the first dose of his 6-dose prescription of Percocet in the afternoon on April 18, 2024, at the time of his examination by Dr. Bialor and Nurse Garcia. *See* paragraphs 33–34 above. His April 18, 2024 dose of oxycodone with acetaminophen thus did not need to be dispensed in the pill line. (Tr. 34:9–35:17.)

42.     Mr. Goulbourne was given two doses of Percocet on April 19th and two doses on April 20th.  (Tr. 35:18–36:18; Ex. MDCX-H.)  The doses were given to him on the morning and afternoon pill lines on those days.  (*Id.*)

43.     He was not given his last dose of Percocet on the pill line in the morning on April 21st because he refused to provide identification.  (Tr. 36:19–37:17; Ex. MDCX-H.)

**E. Mr. Goulbourne's Encounters with MDC Medical Personnel Between April 19 and April 25, 2024**

44.     In the one week between the end of his April 18, 2024 examination by Dr. Bialor and Nurse Garcia and April 25, 2024, Mr. Goulbourne was seen three times by MDC medical personnel.

45.     On April 20, 2024, at 3:30 p.m., Mr. Goulbourne was seen by Beverly Timothy, a nurse practitioner, after raising complaints of breakthrough pain.  (Ex. MDCX-I at DNJ0082; Tr. 38:11-21.)  Mr. Goulbourne had received his dose of Percocet on the pill line less than four hours earlier.  (Tr. 39:5-14; Ex. MDCX-H.)

46.     In response to Mr. Goulbourne's complaints Ms. Timothy ordered a 7-day course of acetaminophen sufficient for Mr. Goulbourne to take one tablet four times per day.  (Ex. MDCX-I at DNJ0082; Tr. 39:2-4.)  Later the same day (April 20), Mr. Goulbourne also received his second dose of Percocet.  (Tr. 39:15-18; Ex. MDCX-H.)

**F.  Mr. Goulbourne's Transfer to the Special Housing Unit**

47.      On the afternoon of April 23, 2024, Mr. Goulbourne was placed in the SHU.  (*See* DNJ0395–DNJ0400 (Mr. Goulbourne's original and rewritten Incident Reports; original Incident Report dated April 23, 2024).)[4]

48.      According to Dr. Bialor's understanding, self-carry medications are supposed to go with an inmate who is being transferred to the SHU.  (Tr. 40:10-13.)  Dr. Bialor was not aware on April 23rd or April 24th that Mr. Goulbourne allegedly did not have his self-carry medications in the SHU.  (Tr. 40:14-25.)

49.      With regard to MDC policies and practice regarding transfer of medication to the SHU, Nurse Garcia and Mr. Glucksnis also testified at the January 13 Hearing that medication is supposed to follow an inmate into the SHU and the medical staff does rounds to check whether the inmate has what he needs.  (Tr. 133:23-24; 115:21–116:7.)  Mr. Glucksnis's understanding was that an inmate's medications get to the SHU in one of two ways: either officers pack up the inmate's property and send it to the SHU with the inmate; or the inmate's medications are sent to the pharmacy which then transmits them to the SHU (either repackaged or through a replacement order).  (Tr. 133:8-17.)  Mr. Glucksnis further testified that "the biggest fail safe is every morning, a nurse does rounds in special housing unit and they go to every door and they look in every window and if any inmates say, hey, I have this medication that I'm supposed to have, they just tell that nurse and then the nurse reports it."  (Tr. 134:10-14.)  Nurse Garcia similarly

---

[4] Mr. Goulbourne's transfer to the SHU followed an incident in which, according to both the original and the rewrite of the Incident Report, Mr. Goulbourne threatened an MDC medical staff member.  (*See* DNJ0395-DNJ0400.)

testified that her regular practice in the SHU is to go door to door and ask inmates if they have any needs.  (Tr. 116:24–117:2-6, 117:18-23.)

50.    The medical staff do rounds in the SHU every day to determine what needs inmates have.  (Tr. 40:22–41:1, 116:2-7, 134:9-14.)

51.    On April 24, 2024, Mr. Goulbourne had an encounter with Nurse Garcia while Nurse Garcia was doing her rounds in the SHU.  (Tr. 117:24–118:4, 118:17-19.)

52.    One of the things Nurse Garcia asks during her rounds is if the inmate needs medication.  (Tr. 117:18-23.)  Nurse Garcia writes down anything the inmate makes her aware of to make sure the need is addressed.  (Tr. 117:18-23.)  The only time she makes a written note is if the inmate lets her know anything, and if he does, she addresses it.  (Tr. 118:11-15.)

53.    While doing her SHU rounds on April 24, 2024, Nurse Garcia saw Mr. Goulbourne and spoke to him.  He did not raise with her any medical needs, nor make any asks. They talked about why he was in the SHU.  (Tr. 118:17–119:4, 114:23–115:2 (while in the SHU "[i]t was never mentioned by him to me that he didn't have his antibiotics").)  Rather, "he was more concerned of why he was placed in SHU."  (Tr. 119:6-7.)  In keeping with her practice Nurse Garcia did not create any written note reflecting her discussion with Mr. Goulbourne.  (Tr. 118:2-15.)

54.    If Mr. Goulbourne had asked Nurse Garcia, as the medical staff person making the rounds in the SHU, for any of his prescribed medication he would have gotten it.  (Tr. 81:23–82:4.)

55.    If Mr. Goulbourne was transferred to the SHU without his antibiotics, assuming he had taken his medication as prescribed up to that point, at most he missed one dose of his

prescribed course of ten pills if he took them twice a day as prescribed.  (Tr. 31:25–32:9, 32:23–33:1.)

56.    If Mr. Goulbourne was unable to finish his course of antibiotics due to being transferred to the SHU without his remaining dose of antibiotics, it did not have consequences for him because his infection resolved, as further discussed below.  (Tr. 33:2-11.)  In addition, as discussed further below, Mr. Goulbourne did not tell the medical staff that did daily rounds on the SHU that he did not have his antibiotics or Tylenol.  (Tr. 40:22–41:1, 116:2-7, 134:9-14.)

57.    In sum, when Mr. Goulbourne's defense counsel emailed the MDC on the afternoon of April 24, 2024, suggesting that Mr. Goulbourne had a ruptured appendix that was potentially life threatening (that email is set forth below in paragraph 71), (i) Mr. Goulbourne had had his appendix removed eight days earlier, on April 16, 2024; (ii) Mr. Goulbourne never had a ruptured appendix; (iii) Mr. Goulbourne did not raise any medical issue when Nurse Garcia spoke to him during her SHU rounds on April 24, 2024; (iv) Mr. Goulbourne was provided with a bag containing a full, 10-dose course of antibiotics upon his return from the hospital; (v) Mr. Goulbourne could have taken at least 9 of 10 doses of his 10-dose antibiotic (Cephalexin) regimen before being transferred to the SHU on the afternoon of April 23, if he took it as prescribed, given that he received his first dose on the afternoon of April 18 and was sent to the SHU on the afternoon of April 23;[5] (vi) Mr. Goulbourne was prescribed a full course of narcotic pain medication upon his return from the hospital, which was dispensed to him in accordance

---

[5] The undisputed evidence shows that Mr. Goulbourne was given his first dose on the afternoon of April 18.  There is no claim that he did not receive his self-carry bag on April 19 or that anyone interfered with his ability to take two capsules daily before he was transferred to the SHU on the afternoon of April 23. If he took one capsule on April 19; two each (as directed) on April 20, 21, and 22, and one on the morning of April 23, that makes nine capsules out of his course of 10 capsules.

with MDC rules; and (vii) Mr. Goulbourne was given an additional 7-day course of over-the-counter pain medication when he complained of pain on April 20, a day he was also given two doses of the narcotic pain killer Dr. Bialor ordered for him.

58.     Nurse Garcia saw Mr. Goulbourne again during her SHU rounds on the morning of April 25, and asked him how he was doing.  Mr. Goulbourne replied that he was having some pain and drainage.  (Tr. 111:24–112:5.)

59.     In response to Mr. Goulbourne's complaints, Nurse Garcia took steps to have Mr. Goulbourne taken to the Medical Unit to be evaluated that same day.  (Tr. 112:6-20.)

60.     In the Medical Unit, Nurse Garcia examined Mr. Goulbourne.  Upon examining his incision, Nurse Garcia observed that he had no redness, swelling, drainage, or other sign of an active infection.  (Tr. 112:18–113:8.)  Nurse Garcia recorded those observations in her contemporaneous medical note of her April 25, 2024 evaluation of Mr. Goulbourne. His incision was closed, healing and clear.  (Tr. 112:24-25; Ex. MDCX-J at DNJ0079.)

61.     Exhibit J is Nurse Garcia's contemporaneous medical note of her April 25, 2024 examination of Mr. Goulbourne, and accurately reflects what occurred at that encounter.  (Tr. 113:9-21; Ex. MDCX-J.)

62.     During Nurse Garcia's examination, Mr. Goulbourne complained of some pain around the site of his incision.  (Tr. 113:22.)  In response, Nurse Garcia told Mr. Goulbourne that he should continue to take the Tylenol that was ordered for him previously.  (Tr. 114:7-13.)

63.     Mr. Goulbourne did not say that he lacked the Tylenol that was previously ordered for him.  (Tr. 114:11-15.)

**G. The Independent Medical Evaluation in Early May 2024**

64.     On May 1, 2024, Dr. Bialor examined Mr. Goulbourne at 8:55 a.m.  (Tr. 41:6–

42:8; Ex. MDCX-K (copy of the notes of the examination).)  Dr. Bialor found that Mr.

Goulbourne's incision from his surgery had healed.  (Tr. 41:6-18.)  Dr. Bialor further found that

Mr. Goulbourne did not need any additional antibiotics because the redness around his incision

had resolved.  (Tr. 41:19–42:8; Ex. MDCX-K.)

65.    Giving Mr. Goulbourne additional antibiotics at that time, when he did not need

them, could be detrimental to his health.  (Tr. 42:1-8.)

66.    At the time of his examination of Mr. Goulbourne on May 1, 2024, Dr. Bialor

prescribed Mr. Goulbourne acetaminophen for pain and docusate sodium capsules as a stool

softener.  (Tr. 42:13-18; Ex. MDCX-K.)

67.    As ordered by the Court, Dr. Bialor wrote to the Court on May 2, 2024, regarding

his medical opinion as to whether Mr. Goulbourne required any antibiotics at that time.  (Tr.

42:19-24; Ex. MDCX-L.)  In the letter, Dr. Bialor stated that it was his medical opinion that

since the redness had resolved, there was no clinical indication (need) for Mr. Goulbourne to

take additional antibiotics.  (Ex. MDCX- L.)

68.    As ordered by the Court, on May 2, 2024, Dr. Bialor requested that Mr.

Goulbourne be evaluated at a hospital regarding whether he needed further antibiotic treatment.

(Tr. 42:25–43:9; Ex. MDCX-M.)

69.    Mr. Goulbourne was evaluated on May 2, 2024, by a physician at Brooklyn

Hospital.  (Tr. 43:10-22; Ex. MDCX-N (hospital consultation report).)  An ultrasound was

performed by the hospital and, based on the ultrasound report and the examination, the

consulting physician found "No antibiotics needed at this time."  (Tr. 43:10-22; Ex. MDCX-N at

DNJ0127.)

70.    Mr. Goulbourne was next seen on May 10, 2024, in the Medical Unit, after he

19

complained of acid reflux.  (Tr. 119:11-25; Ex. MDCX-O.)  Nurse Garcia examined his incision

and observed that it had healed appropriately.  (Tr. 120:1-6; Ex. MDCX-O at DNJ0071 ("All

incisions healed from his previous surgery.").)

### H. Defense Counsel's April 24 Email to the MDC Legal Department and the Communications that Followed

#### <u>April 24</u>

71.    At 3:06 p.m. on Wednesday, April 24, 2024, Mr. Biale sent an email (the "April

24 Email") to Sophia Papapetru, the Supervisory Attorney in the Legal Department, and Irene

Chan, a Staff Attorney in the Legal Department.  (Ex. MDCX-P at DNJ0048; Tr. 161:5-15.)  It

read:

> Subject: Urgent: Jonathan Goulbourne, Reg. No. 85735-509
>
> Sophia and Irene,
>
> I am writing regarding an alarming situation involving my client Jonathan Goulbourne.  I understand that on Sunday the 14th, he started experiencing severe abdominal pain and nausea and reported it to the CO on duty.  He was essentially told to stop complaining.  On Monday the 15th he collapsed and was taken to the hospital.  He was diagnosed with having a ruptured appendix and had surgery the following day.  I understand that last Thursday he was discharged with a prescription for antibiotics and Percocet.  I am told he was given the Percocet until the weekend lockdown when the CO on duty refused to give it to him, though he was still in serious pain.  Yesterday my associate visited him, and he asked us to help him get his pain medication.  I am told that after that meeting, Mr. Goulbourne was sent to the SHU because a nurse construed his statement that he would "get his lawyers involved" to get his medicine as a threat.  He has now been in the SHU for more than 24 hours where not only has he not received Percocet but apparently has not received his antibiotics.  As you likely know, a ruptured appendix spreads infection around the body and is potentially **<u>life-threatening</u>** if not treated with surgery **<u>and</u>** antibiotics.  Please get him his antibiotics immediately as he has likely already missed one or two doses.  Please also provide his Percocet twice daily as prescribed.  I would also like you to provide me with his medical records as soon as possible so I can review what has been done.

(Ex. MDCX-P at DNJ0048 (emphasis in original).)  The AUSAs handling Mr. Goulbourne's criminal case were also copied.

72.     At 3:17 p.m. on April 24, Ms. Chan forwarded the April 24 email internally to members of the MDC medical and pharmacy staff asking them to "advise as soon as possible" on Mr. Goulbourne's post-surgical medication.  (Ex. MDCX-P at DNJ0048.)  Ms. Chan copied Staff Attorneys Rachel Kull and Elizabeth Lynch on her internal email.  (Ex. MDCX-P at DNJ0048.)

73.     The MDC Legal Department at that time was comprised of four attorneys:  Ms. Papapetru (the Supervisory Attorney), and Staff Attorneys Irene Chan, Rachel Kull, and Elizabeth Lynch.  (Tr. 161:5-15.)  Neither Ms. Kull nor Ms. Lynch was included on Mr. Biale's April 24 Email.  (Ex. MDCX-R at DNJ0004-DNJ0005.)

74.     Of particular relevance, Ms. Lynch had only just begun her employment as an MDC Staff Attorney.  In fact, April 24 was her very first day sitting in the Legal Department. (Tr. 158:2-12.)

75.     While Ms. Lynch's employment at the MDC had officially begun earlier that month, on April 8, 2024, she had spent her first two weeks — *i.e.*, the weeks of April 8-12 and April 15-19, 2024 — exclusively taking classroom-based training on the duties of a correction officers and "BOP-101."  (*See* Tr. 155:8-10, 156:24–157:5, 157:7-11.)  That training was not specific to the role Ms. Lynch would be performing nor the responsibilities she would have as a Staff Attorney.  (*See* Tr. 157:14–158:1, 223:12-17.)  At the beginning of her third week at the MDC — April 22 and April 23, 2024 — Ms. Lynch was assigned to shadow corrections officers in different housing units of the MDC.  (Tr. 158:21-25.)  Accordingly, Ms. Lynch's first day in the Legal Department was April 24.  (Tr. 158:2-12.)

76.     On the morning of April 24, Ms. Lynch met with Ms. Papapetru, her supervisor, who instructed her to "review the emails that [she] had been copied on to see what types of inquiries" the Legal Department receives and how the Staff Attorneys go about responding to them.  (Tr. 158:3-10.)  Ms. Papapetru told Ms. Lynch not to respond to any external emails on which she might be copied unless specifically directed (Tr. 162:3-8), and further directed Ms. Lynch to approach her (Ms. Papapetru) or another Staff Attorney with any questions that arose as she reviewed the emails in her inbox.  (Tr. 159:21–160:10.)[6]  Ms. Lynch did as she was told. She started reviewing the emails in her inbox and saw that the other attorneys in the Legal Department had been copying her on emails since her official start date at the MDC two-and-a-half weeks before.  (Tr. 159:21–160:3.)  Accordingly, she had hundreds of emails to review "[f]or learning purposes."  (Tr. 159:25–160:10, 163:4-6, 163:21-22.)  Based on her review of emails over the course of her first few days in the Legal Department, Ms. Lynch learned that the members of the Legal Department often copy each other on emails as a matter of practice, to ensure appropriate coverage in the event someone is out of the office.  (*See* Tr. 163:6-10.)

77.     Ms. Lynch's regular working hours were 7:30 a.m. to 3:30 p.m.  (Tr. 161:19.)  As of April 24, she did not yet have a BOP-issued laptop or cellphone.  (Tr. 161:20-23.)  She only had access to her MDC email when she was onsite at MDC.  (Tr. 161:24–162:1.)

---

[6] Ms. Papapetru had also instructed Ms. Lynch to review a document titled "Attorney Access Guide to MDC Brooklyn" (the "Guide"), which is a "guide for defense attorneys . . . [on] how to get access to their clients that are housed at MDC."  (Tr. 159:7-13.)  That Guide, which Ms. Lynch reviewed, is not relevant to the inquiry before the Court.  The Guide did not provide information regarding the role or responsibilities of a Staff Attorney or otherwise address topics relevant to Mr. Biale's April 24 Email, such as resolving inquiries regarding an inmate's prescription medications or inmate transfers between housing units.  (Tr. 159:10-20.)

78.     Meanwhile, soon after Ms. Chan sent her internal 3:17 p.m. email seeking information about Mr. Goulbourne's medical care, MDC pharmacy staff began responding. (*See* Ex. P, DNJ0047.)  The MDC pharmacy staff provided a chart excerpt showing that Mr. Goulbourne had been issued 10 pills of Keflex antibiotic on April 19; they further explained that Mr. Goulbourne had been administered Percocet through the "pill line only (never self-carry)." (Tr. 164:2-4; Ex. MDCX-P at DNJ0047.)  Ms. Chan asked a follow-up question at 3:31 p.m. regarding the Percocet. (*See* Ex. MDCX-P at DNJ0046.)

## **April 25**

79.     Internal email discussion about Mr. Goulbourne's medication continued early the next morning on April 25.  At 6:34 a.m., a member of the pharmacy staff, Calvin Truong, responded to Ms. Chan, stating that Mr. Goulbourne "**did** receive pill line Percocet on the 19th and 20th" but did not receive his last dose on April 21 because he failed to provide identification to the pill line staff.  (Ex. MDCX-P at DNJ0046 (emphasis in original); Tr. 165:19–166:6.)

80.     On April 25 at 9:22 a.m., in a different email chain that went to Legal Department attorneys Papapetru, Chan, and Kull — *but not to Ms. Lynch* — AUSA Tara McGrath asked the Legal Department to respond to Mr. Biale "as a matter of urgency."  (Ex. MDCX-Q at DNJ0014.)

81.     Later that same morning, at 11:28 a.m., Duvinka Jordan-Rosario, an Assistant Health Services Administrator, responded to the internal email chain with Ms. Chan, providing additional information regarding all of Mr. Goulbourne's medication:

> Antibiotics were for 5 days (self-carry)
> Percocet was for 3 days (pill line)
> Seen today, wounds healed.  He can continue taking Tylenol for pain as needed.
> Treatment completed.

(Ex. MDCX-P at DNJ0046; Tr. 167:3-6.)

23

82.    When Ms. Lynch went home for the day on April 25, she did not know about the

email sent by AUSA McGrath because she had not been copied on it, nor if Ms. Chan or anyone

else from the MDC had responded to Mr. Biale because she had not been copied on the external

email chain with Mr. Biale.  (Tr. 169:3-11.)

83.    At 4:51 p.m. on April 25, Mr. Biale sent the Legal Department a follow-up email

indicating that he had not yet received a response from BOP to his April 24 Email.  (Ex. MDCX-

R at DNJ0003.)  Again, Ms. Lynch was not included on that external email, which was also sent

after she would have left for the day.  (Ex. MDCX-R at DNJ0003.)

### April 26

84.    On Friday, April 26, Ms. Lynch and Ms. Papapetru were the only members of the

Legal Department onsite.  (Tr. 169:12-18.)  Ms. Chan and Ms. Kull were not in the office.  (*See*

Tr. 169:12-18.)  However, between 8:00 a.m. and 9:00 a.m., Ms. Papapetru left unexpectedly to

tend to a medical emergency.  (Tr. 169:20-24.)  Accordingly, from 9:00 a.m. onward on April

26, Ms. Lynch was the only member of the Legal Department onsite.  (Tr. 169:25-170:2.)

85.    Just before 2:00 p.m., Ms. Papapetru called Ms. Lynch saying that she would

forward Ms. Lynch an "urgent" email and that Ms. Lynch should "respond as soon as possible."

(*See* Tr. 170:3-9.)  Ms. Papapetru did not give her any background regarding the email or any

guidance with respect to how to respond, including what steps she should take before responding

or from where she should obtain any information that might be needed to respond.  (Tr. 170:10-

12, 219:11-25.)  At 1:58 p.m., Ms. Papapetru then forwarded an email chain to Ms. Lynch and

several MDC medical staff members relating to Mr. Goulbourne writing, "Please see below and

please assist Liz asap." (Ex. MDCX-Q at DNJ0013.)  This was the first time that Ms. Lynch had

been instructed by her supervisor to do anything relating to Mr. Goulbourne.  Ms. Lynch was

also copied into the external email chain with Mr. Biale and the AUSAs, in which at 1:59 p.m.

AUSA McGrath emailed Ms. Papapetru that the government was "still waiting for confirmation"

about Mr. Goulbourne's antibiotics and pain medicine.  (Ex. MDCX-R at DNJ0002–DNJ0003.)

86.    Ms. Lynch recalled that she had previously seen emails regarding Mr. Goulbourne

and immediately searched her emails and located the various email responses from MDC

medical and pharmacy staff contained in Exhibit P.  (Tr. 175:15-23, 175:17-19.)  Given that both

Ms. Papapetru and AUSA McGrath had noted the matter's urgency, Ms. Lynch "wanted to

respond as quickly as possible if [she] had [responsive] information."  (Tr. 175:19-23.)

87.    Ms. Lynch reviewed the email chain (Exhibit P) in its entirety and focused in

particular on Ms. Jordan-Rosario's final email in the chain — sent April 25 at 11:28 a.m. —

which was authoritatively worded and which Ms. Lynch understood at the time to squarely

address the concerns raised by Mr. Biale in his April 24 Email.  (Tr. 176:1-4, 177:16–179:3.)

Ms. Lynch read Mr. Biale's April 24 Email as questioning whether Mr. Goulbourne had received

his Percocet and antibiotic, and Ms. Jordan-Rosario's email answered, in the past tense, stating

that his "[a]ntibiotics were for five days," that his "Percocet was for 3 days," that he had been

"[s]een today," (April 25, that very day), that his "wounds healed," that he could "continue

taking Tylenol for pain as needed," and that his "[*t*]reatment completed."  (Ex. MDCX-P at

DNJ0046 (emphasis added); Tr. 167:7-15.)

88.    Ms. Lynch believed she had sufficient information to respond to Mr. Biale's

inquiry and she trusted that the information provided by the medical staff was accurate.  (Tr.

178:20–179:3, 184:2-5.)  At 2:11 p.m. on April 26, approximately 15 minutes after receiving Ms.

Papapetru and AUSA McGrath's emails, Ms. Lynch drafted and sent the following email in

response to Mr. Biale's April 24 Email, referring back to Ms. Jordan-Rosario's email as she

typed (the "April 26 Response") (Tr. 177:4-8):

> Good afternoon,
>
> Per my conversation with medical staff it is my understanding that AIC Goulbourne
> has received the prescribed antibiotics and pain medication. As the pain medication
> is a controlled substance, he received that medication from the pill line. The
> antibiotics were provided to him as self-carry medication.
>
> Additionally, he was seen yesterday by medical staff. Based on their consult with
> AIC Goulbourne yesterday, it appears his wounds have healed and he was advised
> to take Tylenol for pain as needed moving forward.

(Ex. MDCX-R at DNJ0002.)[7]

89.     In referring to her "conversation with medical staff," Ms. Lynch intended to

convey that she had received the information she was conveying from an appropriate third-party

source, *i.e.*, medical staff.  (Tr. 178:5-9.)

90.     Although it might have been more conventional for Ms. Lynch to have written,

"Per emails with medical staff," Ms. Lynch did not intend to create a misimpression and had no

reason to do so.  (*See* Tr. 178:5-179:3.)  This Court can also take judicial notice that email

dialogue is frequently referred to as "conversations."  Indeed, Google and other servers have

email "conversation settings."  *See Group emails into conversations*, Gmail Help,

https://support.google.com/mail/answer/5900.

91.     Ms. Lynch did not personally converse with any medical staff beyond reviewing

the medical staff's emails "because [she] believed the information [she] had was sufficient to

respond to defense counsel's inquiry," including her understanding from the emails (and in

---

[7] While Exhibit W, DNJ0024 lists the April 26 Response as having been sent on Friday, April 26 at *11:11 a.m.*, that may be because Mr. Biale was on the West Coast when he received it.  As Ms. Lynch's testimony and Exhibit R both confirm, the correct time stamp is 2:11 p.m. EST. (*See* Tr. 170:3-9 (Ms. Papapetru called Ms. Lynch "[i]n the afternoon" before forwarding the email chain); Ex R. DNJ0002.)

particular from Ms. Jordan-Rosario's email) that Mr. Goulbourne had received his antibiotics, completed his treatment, and been seen by medical staff on April 25th, that his wounds had healed, and that he could continue taking Tylenol for pain as needed.  (Tr. 178:5–179:4, 179:9–180:5, 183:10-17; *see also* Tr. 184:2-5 ("I believed she [Ms. Jordan-Rosario] had the correct information based on her supervisory status in the medical department and access to the medical records, as well as her statement that he had been seen that day and his wounds had healed.").)

92.    With respect to the Percocet, although Ms. Lynch understood from the full email chain with Ms. Jordan-Rosario's email that Mr. Goulbourne had not received his last dose of Percocet (due to his not presenting identification), Ms. Lynch did not address the one missed dose in her April 26 Response because she understood from Ms. Jordan-Rosario's statement regarding Tylenol that a determination had been made by medical staff earlier that same morning (when Mr. Goulbourne had been evaluated) that he did not require additional Percocet.  (Tr. 179:19–180:5.)

93.    After sending her 2:11 p.m. April 26 Response, Ms. Lynch immediately received (at 2:11 p.m.) out-of-office messages from Mr. Biale and his associate.  (*See* Exs. MDCX-S at DNJ0006 & MDCX-T at DNJ0007.)

94.    At 2:12 p.m., Ms. Lynch received an email from AUSA McGrath, thanking her for responding to Mr. Biale.  (*See* Ex. MDCX-U at DNJ0008.)

95.    At 2:37 p.m., Ms. Lynch received an email from Mr. Glucksnis, responding to the internal chain from earlier in the day in which Ms. Papapetru had asked the medical staff to "assist Liz asap."  (Ex. MDCX-Q at DNJ0012-DNJ00013.)

96.    Mr. Glucksnis was an Assistant Health Services Administrator at the MDC, responsible for, among other things, "replying to legal concerns" concerning adults in custody.

(Tr. 128:7-11.)  Before sending his email to the Legal Department, Mr. Glucksnis reviewed medical records.  (Tr. 137:1-2.)

97.    Mr. Glucksnis's email confirmed that (1) the Percocet prescription was for three days and had expired on April 21; (2) the antibiotic prescription had expired on April 24; and (3) Mr. Goulbourne was seen by medical staff on April 25, at which point there were "no indications of any infection" and "no need for additional [antibiotics]."  (Ex. MDCX-Q at DNJ0012.)

98.    By the time Ms. Lynch received Mr. Glucksnis's email, she had already sent her April 26 Response to Mr. Biale.  However, she reviewed Mr. Glucksnis's email upon receipt to be sure its contents were consistent with what other medical staff had written previously, and what she, accordingly, had written to Mr. Biale.  (Tr. 186:19-25.)  It was.  She thus saw no need to supplement her April 26 Response.  (Tr. 187:1-8.)

99.    Soon after sending her April 26 Response and reviewing Mr. Glucksnis's email, Ms. Lynch received a call that required her to leave her desk to address a matter in another building at MDC.  (Tr. 191:3-12.)  By the time she returned, it was after 3:30 p.m. (and thus after the conclusion of her working hours).  (Tr. 191:12-13.)  Not expecting to receive any emails that would require her attention, she left for the day without further reviewing emails, and therefore did not see Mr. Biale's response (discussed in the next paragraph below) until she returned to work the following Monday (as she did not have remote access to her email).  (*See* Tr. 191:12-17; *see* Tr. 161:19 (Ms. Lynch's regular working hours were 7:30 a.m. to 3:30 p.m.); Tr. 161:20-23 (Ms. Lynch did not have a BOP-issued laptop or cellphone).)

100.    On Friday, April 26, at 3:12 p.m., Mr. Biale sent the following email to the Legal Department and AUSAs:

Thank you for the response, Elizabeth.

My associate Martin (cc'ed) visited him this morning and here is our understanding of the issue: While he technically has his antibiotics and Tylenol, they are in his locket [sic] in his unit and he has not been able to access them since he was taken to the SHU.  Accordingly, he has not been able to take any medicine for the last 72 hours.  He also has not been able to get Percocet from the medical staff since last Friday.  He confirmed that he was seen by medical staff yesterday.

Martin left the SHU at 1:10 PM today so it's possible that in between then and when you sent your email he received his medication.  Could you please confirm that?  If that's not the case, he needs to have it in his <u>actual possession,</u> not just in his locker, especially as we go into the weekend when you will be short-staffed.  Please confirm that he has it before close of business today.

Also, I would like you to send the medical records and SHU ticket to me as soon as possible.  I understand he was written up for threatening a nurse by saying his lawyers would take care of the situation.  It is totally inappropriate to send someone to the SHU for that reason.  Please advise ASAP.

(Ex. MDCX-W at DNJ0023.)  As noted above, Ms. Lynch saw this email from Mr. Biale on

Monday, April 29.  (Tr. 193:16-20.)  The record does not reflect whether others at BOP saw it

sooner.

## **April 29**

101.     On April 29, Ms. Chan and Ms. Lynch were the only members of the Legal

Department onsite.  (Tr. 193:21-23.)  Ms. Papapetru, who does not work on Mondays but

sometimes monitors emails remotely, was not in the office, nor was Ms. Kull.  (*See* Tr. 193:24-

194:1.)

102.     In follow-up to his Friday April 26, 3:12 p.m. email clarifying that Mr.

Goulbourne "technically has his antibiotics and Tylenol," but that those medications were in his

unit locker which he could not access from the SHU (Ex. MDCX-W at DNJ0023), Mr. Biale also

sent an email at 9:35 a.m. on Monday seeking confirmation that Mr. Goulbourne had actual

possession of his medication in the SHU.  (*See id.*)  From reading those emails, Ms. Lynch better

understood defense counsel's issue.  (Tr. 194:13-18.)

103.    On Monday, April 29 at 9:37 a.m., Ms. Papapetru forwarded Mr. Biale's emails to MDC medical staff and directed them to advise; she also copied Ms. Lynch.  (Ex. MDCX-W at DNJ0021-DNJ0022.)  Mr. Ladyzhenskiy wrote at 9:41 a.m.: "Antibiotic end date is 4/24/24. Pharmacy replaced the only order that is active (docusate)[.]  All other medications are inactive." (Ex. MDCX-W at DNJ0022.)

104.    At 10:00 a.m., Mr. Truong replied for the Pharmacy with additional details:

Percocet prescription ended on 4/20/2[]4, he was sent to SHU on 04/24/24.  I will attach below the EMAR report as well as the pyxis report.  He received **every single dose** of his prescribed Percocet **EXCEPT the last** one on **Sunday morning** because he was **refusing to give identification to the person conducting pill line**. This goes against policy, so the person was unable to give him the last dose.  He was given his **first dose by Nurse Garcia on 04/18/2024 around 3:09PM**.  His only active medication at the time he was sent to SHU was docusate, which was replaced.  His antibiotic, Cephalexin is a self-carry that **if taken correctly** by AIC, should have finished on 04/24/24 in the morning.  His only active medications after these two were docusate (which was filled today and will be sent to him) and acetaminophen (tylenol) which was filled on 04/22/24.

(Ex. MDCX-W at DNJ0021-DNJ0022 (emphasis in original).)  Mr. Truong also included a screenshot of a chart of Mr. Goulbourne's medication records.  (*Id.*)

105.    At 10:02 a.m., Mr. Truong followed up with one modification: "Correction, Percocet script ended on 04/21/2024 after the AM dose."  (Ex. MDCX-W at DNJ0021.)  Because Mr. Truong followed up in a second email (at 10:02 a.m.) to correct the date that the Percocet script ended, Ms. Lynch understood that he had re-read his first email to confirm accuracy after sending it at 10:00 a.m.  (Tr. 200:20–201:6.)  The impression made on Ms. Lynch was that Mr. Truong "had taken care to review and provide us with accurate information" and "that if there was any other incorrect information, he would have provided it."  (Tr. 201:1-6.)

106.    The pharmacy staff thus told the Legal Department that Mr. Goulbourne's prescribed dosages for Percocet and the antibiotic had both ended by the time "he was sent to SHU on 4/24/24."  (Ex. MDCX-W at DNJ0021; Tr. 195:16-21.)

107.    Accordingly, Ms. Lynch reasonably understood Mr. Truong's 10:00 a.m. and

10:02 a.m. emails to mean that Mr. Goulbourne's Percocet and antibiotic prescriptions would

have been finished prior to his transfer to the SHU.  (Tr. 195:16-21, 195:22–196:2, 201:1-6; Ex.

MDCX-W at DNJ0021-DNJ0022.)  Although Ms. Lynch had no reason to question Mr.

Truong's representations regarding when Mr. Goulbourne had been transferred to the SHU, it

bears noting that, as of this time, Ms. Lynch had received no training regarding the existence of

MDC systems that maintained records of inmate transfers between housing units, including the

SHU.  (Tr. 206:21–207:16.)  Nor was she told that the MDC maintained records regarding when

an inmate entered or left the SHU.  (Tr. 208:11-15, 210:15-20.)

108.    Ms. Lynch and Ms. Chan (who had four years of experience as a Staff Attorney in

the Legal Department) agreed that Ms. Lynch would respond to Mr. Biale since she had

responded to Mr. Biale the Friday before.  (Tr. 161:16-17, 194:2-12.)  Because Ms. Lynch was

"still new" to her role, she asked Ms. Chan to review her draft email back to Mr. Biale to be

"sure that [Ms. Chan] didn't believe [Ms. Lynch] was missing any information."  (Tr. 203:6-16.)

Ms. Lynch then sent the following email to Mr. Biale at 10:33 a.m. on April 29:

> Good morning,
>
> Per my conversation with medical, it is my understanding that the Percocet
> prescription expired on 4/21/2024.  This was prior to your client being transferred
> to the SHU.  The antibiotic medication was completed on 4/24/2024.  Therefore,
> he would not have those in his possession at this time.  As previously indicated, he
> was seen by medical on 4/25/2024 and it was determined he did not need additional
> antibiotics.
>
> If you would like a copy of your clients medical records please provide a HIPAA
> release and Touhy letter.  Additionally, as previously discussed with your office,
> we cannot provide you with a copy of the SHU ticket, you may obtain that
> document from your client.

(Ex. MDCX-Y at DNJ0029.)

109.    Ms. Lynch based the first paragraph of her April 29 Response to Mr. Biale on Mr. Truong's April 29 emails from 10:00 a.m. and 10:02 a.m., which indicated that both the Percocet and antibiotic prescriptions had been completed before Mr. Goulbourne was sent to the SHU on April 24, and on Ms. Jordan Rosario's April 25, 11:28 a.m. email indicating that Mr. Goulbourne was seen by medical on April 25, that his wounds had healed, and that his treatment was completed.  (Tr. 201:22–202:16.)[8]

110.    Mr. Biale responded to Ms. Lynch's email at 1:27 p.m., on the chain that included the AUSAs and all four Legal Department attorneys:

> Here is the problem:  He was transferred to the SHU on 4/23.  Per the medical records I received, it looks like you are correct that the course of antibiotics (Cephalexin) was meant to be completed on 4/24.  But because hew [sic] as [sic] in the SHU, he did not complete the course.  Antibiotics like Cephalexin must be taken until the prescription is completed.  *See* https://medlineplus.gov/druginfo-/meds/a682733.html ("Continue to take cephalexin until you finish the prescription even if you feel better.  If you stop taking cephalexin too soon or skip doses, your infection may not be completely treated and the bacteria may become resistant to antibiotics.").  Can you please ensure that he receives the remaining doses, or, if you cannot do that, please advise ASAP so I can seek relief from the Court.

(Ex. MDCX-Y at DNJ0028.)

111.    Mr. Biale was correct that Mr. Goulbourne had been brought to the SHU on April 23, not on April 24 as reflected in the representations that had been made to Ms. Lynch by

---

[8] In the second paragraph of her response, Ms. Lynch referred to a call she answered on Thursday, April 25, from an individual from Mr. Biale's office who called on behalf of her client, Mr. Goulbourne.  (Tr. 168:6-15.)  The caller sought a copy of Mr. Goulbourne's SHU ticket.  (*Id.*)  Ms. Lynch had placed the caller on hold, transferred the call to Ms. Papapetru, and joined Ms. Papapetru in her office while Ms. Papapetru spoke to the caller.  (Tr. 168:15-21.)  Ms. Papapetru had advised the caller that MDC could not provide a copy of the SHU ticket directly to her; she would have to obtain the SHU ticket from her client. (*Id.*)

internal pharmacy staff.  (*See* DNJ0395–DNJ0400 (Incident Report dated April 23, 2024).)  At the time, however, Ms. Lynch did not know that.  (*See* Tr. 203:23–204:7.)

112.    Ms. Lynch saw the discrepancy in dates as between the pharmacy staff and Mr. Biale but, at this point, she understood both that pharmacy staff would have the correct information and that Mr. Truong had double-checked the information he reported to her.  She therefore trusted that the information she had received from the pharmacy staff was correct.  (*See* Tr. 200:7-12.)  On the other hand, she "wasn't sure [from] where [Mr. Biale] was receiving the information" he included in his email.  (Tr. 204:9-10.)  And while she was generally aware that the MDC maintained a system of records, she had not been trained on it and did not know what records it contained (including whether the MDC maintained records reflecting when an inmate entered or left the SHU).  Nor did she know what records she could access or how to access them, as she also had not been trained on that.  (Tr. 210:5-11, 207:3-9, 223:18–224:3, 210:15-20.)

113.    Accordingly, in light of the above, Ms. Lynch spoke to Ms. Chan about how to address Mr. Biale's April 29 1:27 p.m. email.  (Tr. 207:10-13.)  Ms. Chan advised that they wait to respond until Ms. Papapetru returned to the office the next day so they could discuss the matter with her.  (*See* Tr. 205:5-10.)  Ms. Lynch followed this guidance.  By this point, MDC medical staff had definitively communicated to the Legal Department that Mr. Goulbourne was seen by medical on April 25, that his wounds had healed, that his course of treatment was completed, and that he could take Tylenol for any residual pain as needed.  (Tr. 205:16-25.)  Accordingly, though Ms. Lynch recognized it was important to follow up with Ms. Papapetru the next day to obtain her guidance as to how to address and resolve the inconsistency between the information provided by pharmacy staff and reported by Mr. Biale, and to ensure

that Mr. Biale's concerns were addressed appropriately (and Ms. Lynch did follow up with Ms. Papapetru the next day), Ms. Lynch did not perceive a reason why a response was needed before she had a chance to discuss the matter with Ms. Papapetru upon her return to the office the next day.  (*See* Tr. 205:16-25, 206:6-10.)

114.    On Tuesday, April 30, Ms. Lynch discussed Mr. Biale's email with Ms. Papapetru and sought guidance on what to do.  (Tr. 211:2-5.)  Ms. Papapetru indicated that she would reach out to the captains and handle the matter moving forward.  (Tr. 211:24–212:2.)

115.    At all times and under the circumstances, Ms. Lynch acted reasonably and in close consultation with Legal Department colleagues, and certainly not with any intent to make any misrepresentations.

116.    Mr. Biale raised this matter to the Court that same day.  Motion for Medical Treatment, *USA v. Ricketts*, No. 22-CR-00106 (LDH) (E.D.N.Y. Apr. 30, 2024), ECF No. 330.

Dated: April 1, 2025

Respectfully Submitted,

/s/ Christopher B. Harwood
Christopher B. Harwood
MORVILLO ABRAMOWITZ GRAND
IASON & ANELLO P.C.
565 Fifth Avenue
New York, New York 10017
Telephone: 212.856.9547
Facsimile: 212.856.9494
charwood@maglaw.com
*Counsel for Elizabeth Lynch*

/s/ Nicholas G. Kaiser
Nicholas G. Kaiser
LEVITT & KAIZER
40 Fulton Street, 17th Floor
New York, New York 10038
Telephone: 212.480.4000
nkaiser@landklaw.com
*Counsel for Blake Glucksnis*

/s/ Heidi A. Wendel
Heidi A. Wendel
Law Office of Heidi A. Wendel PLLC
43 West 43rd Street, Suite 184
New York, New York 10036
Telephone: 917.854.1645
hwendel@heidiwendellaw.com
*Counsel for Dr. Bruce Bialor*

/s/ Elizabeth Wolstein
Elizabeth Wolstein
SCHLAM STONE & DOLAN LLP
26 Broadway
New York, New York 10004
Telephone: 212.344.5400
Facsimile: 212.344.7677
ewolstein@schlamstone.com
*Counsel for Marilyn Garcia*

ALINA HABBA
United States Attorney for the District of New Jersey

By: /s/ Matthew J. Mailloux
MATTHEW J. MAILLOUX
Special Attorney
*Acting Under Authority*
*Conferred by* 28 U.S.C. § 515